**Edward L. CAREY**

v.

**Britt HUME, Appellant,**
**Jack Anderson et al.**

**No. 71–1736.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 27, 1972.

Decided Jan. 28, 1974.

Rehearing Denied Feb. 21, 1974.

Petition Dismissed June 5, 1974.
See 94 S.Ct. 2654.

Leonard Appel, Washington, D. C., with whom Warren Woods and Betty Southard Murphy, Washington, D. C., were on the brief, for appellant.

J. Gordon Forester, Jr., Washington, D. C., for appellee.

William R. Glendon and Anthony F. Essaye, Washington, D. C., filed a brief on behalf of the Washington Post Company as amicus curiae.

Before DANAHER, Senior Circuit Judge, and McGOWAN and MacKINNON, Circuit Judges.

McGOWAN, Circuit Judge:

The troublesome legal issue of the compelled disclosure by a journalist of his sources of information gave rise to this interlocutory appeal (28 U.S.C. § 1292(b)) from the District Court. It comes to us in the context of a civil action for libel, as contrasted with the criminal setting in which the Supreme Court has most recently examined the question and sustained compulsion. Branzburg v. Hayes, 408 U.S. 665, 92 S. Ct. 2646, 33 L.Ed.2d 626 (1972). Although there may be discernible degrees of difference in the social interests attaching to the exaction of testimony in the one field as compared with the other, we have concluded, on the basis of both authority and reason, that civil litigation has its entitlements on proper occasion to the pursuit of truth wherever it may be found. We find that this record presents one such occasion; and we affirm the District Court.

## I

The complaint in the District Court alleged that on December 14, 1970, the following item was published in a syndicated daily newspaper column known as "The Washington Merry-Go-Round":

### WASHINGTON EXPOSE

Records Stolen?—With the government digging deeper into the financial affairs of the United Mine Workers, the union's President Tony Boyle and General Counsel Ed Carey spent hours recently going through the records. Later, they were seen removing boxfuls of documents from Boyle's office. Not long afterward, Carey made an official complaint to Washington police that burglars had struck at union headquarters. Among the goods reported stolen: a boxful of "miscellaneous items." The Justice Department is investigating.

The complaint further alleged that this item had been written by appellant and a co-defendant, Jack Anderson, with a malicious purpose to damage appellee's reputation, and with the effect of causing such injury. Substantial compensatory and punitive damages were sought. An answer was filed on behalf of appellant and Anderson, which described appellant as employed by the latter for the purpose of "research, news gathering, and journalistic writing in the course of this employment." Authorship was admitted of the paragraph upon which the complaint was based, but liability was denied. Extensive discovery proceedings were then engaged in by both sides. The facts which follow are derived from a deposition taken of appellant.

Prior to publication of the item in question, appellant established, by direct inquiry at the police department, that the burglary complaint mentioned in the story had in fact been filed with the police. He also attempted to call appellee on the day the story was to go to press, but, being unable to reach him, went forward with publication, apparently

with no further attempt at verification of his facts. The day the story appeared appellee called appellant, and that conversation led to the inclusion of this item in the column published December 15:

> CAREY'S DENIAL—Our report on the circumstances surrounding the reported burglary of a box of "miscellaneous items" from United Mine Workers headquarters has drawn a belated but angry denial from the union's general counsel Ed Carey. . . . "A contemptible, despicable lie," said Carey. Our report was based upon information supplied by eyewitnesses, and we will not retract.

Since this second story indicated that the first had been based on eyewitness observation, appellant was asked the identity of those sources. Although appellant refused, as directed by his counsel, to give their names, he did indicate that there was more than one such informant, and that they were UMWA employees.[1] Appellant also disclosed in the course of the deposition that he did not know the date on which the activities described by him had occurred, but said it could have been any time during the six weeks immediately prior to publication. The claimed eyewitnesses had provided no written statements or affidavits, nor did appellant know of any writing or recording summarizing their accounts of these incidents. He was un-sure whether he had taken notes of the revelations made to him by his informants, and, if so, whether he had preserved them.

Appellee then made a motion under Rule 37(a), Fed.R.Civ.P., to compel appellant to reveal the names of the eyewitnesses. Appellant filed an opposition to this motion, the first ground of which was that the "generic question" raised by the motion was pending before the Supreme Court on petitions for writs of certiorari in the *Branzburg* trilogy of cases; and that because of "the significant posture of the question at issue before the Supreme Court," the motion should be denied pending disposition of the writs.[2] The other grounds advanced by appellant were the constitutional claim of privilege, and the assertion that the information sought was not relevant to appellant's case or material to his proof.

The Pretrial Examiner recommended that appellant be required to answer the questions concerning the eyewitnesses; and the District Court, disallowing appellant's objections to the recommendation, entered an order directing him to do so, with a stay provided pending determination of an appeal. This appeal is from that order.

## II

There is no dispute before us as to the standard of proof which appellee must

---

1. Appellant's counsel made it clear in the deposition transcript that he was limiting his non-disclosure instruction to those eyewitness sources who "have been or are now employed by the United Mine Workers." The witness was permitted to give the names of sources of information who were Government employees, but this information did not relate to the observation of removal of records from the UMW offices. The grounds asserted by counsel at that time as supporting his instruction to appellant were that there was fear of retaliation against UMW employees, and that the First Amendment rights of appellant as a newsman afforded him a privilege not to reveal confidential sources.

2. In addition to *Branzburg*, which involved two judgments of the Kentucky Court of Appeals, the Supreme Court by one opinion also decided In re Pappas [408 J.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626] from the Supreme Judicial Court of Massachusetts, and United States v. Caldwell, 434 F.2d 1081, from the Ninth Circuit. The Supreme Judicial Court of Massachusetts, whose decision in In re Pappas to compel a newsman to testify before a grand jury was sustained by the Supreme Court, has recently held that a journalist must, in the course of pretrial discovery in a tort action for libel, respond to questions seeking the identity of the sources of information used in the writing of the allegedly defamatory news story. Dow Jones & Co. v. Superior Court, Mass., 303 N.E.2d 847 (1973).

meet if he is ultimately to win his case. That standard is the rigorously demanding one of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L. Ed.2d 686 (1964), where the Supreme Court established the principle that a civil libel plaintiff who is a public figure must show that the statement at issue was published with actual malice or in reckless disregard of the truth.[3] In the context of an asserted newsman's privilege to protect confidential news sources, the *Sullivan* rule is a source of tension. On the one hand, the Court's concern that the spectre of potential libel actions might have an inhibiting effect on the exercise of press freedom militates against compulsory disclosure of sources. Contrarily, the heavy burden of proof imposed upon the plaintiff in such a case will often make discovery of confidential sources critical to any hope of carrying that burden.

Some six years before *Sullivan* markedly altered the ground rules for recovery in civil defamation actions, there was decided the case of Garland v. Torre, 259 F.2d 545 (2d Cir. 1958), cert. denied, 358 U.S. 910, 79 S.Ct. 237, 3 L. Ed.2d 231 (1958). The opinion for the court was written by Circuit Judge (now Mr. Justice) Stewart, sitting in the Second Circuit by designation. In that case Judy Garland sued Columbia Broadcasting System, Inc., alleging that the latter had made false and defamatory statements about her, and had authorized or induced their publication in newspapers. An example of such publication was attached to the complaint in the form of some paragraphs appearing in a TV-radio column written by Marie Torre and printed in the New York *Herald Tribune*. The column contained several statements about Garland which Torre in her column attributed to a CBS "network executive."

In an attempt to learn the name of the alleged detractor, plaintiff deposed three CBS executives without success. In a deposition taken by plaintiff Garland, the columnist refused to disclose her sources and was sentenced to 10 days in jail for criminal contempt. On appeal the Second Circuit upheld the District Court, concluding that resolution of the First Amendment issue in the case before it, although perhaps "delicate," was not "difficult." *See* Schneider v. State of New Jersey, 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

The key factor which the Second Circuit identified as allowing it to move confidently to this conclusion was that the "question asked of [Torre] went to the heart of the plaintiff's claim." The decisional process with respect to the constitutional issue before it, said the court, involved a determination of "whether the interest to be served by compelling the testimony of the witness in the present case justifies some impairment of this First Amendment freedom . . ." Conceding that freedom of the press is "basic to a free society," the court went on to say that "basic too are courts of justice, armed with the power to discover truth", and that the "concept that it is the duty of a witness to testify in a court of law has roots fully as deep in our history as does

---

3. In an earlier stage of this litigation there was some intimation by appellee that he was not a public figure within the reach of *Sullivan*. He has since, however, expressly disclaimed that position. *See* Curtis Publishing Company v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In any event, because of the recent focus of public attention upon the affairs of the United Mine Workers, there would seem to be no question as to the applicability of the *Sullivan* standard. Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971).

We have recognized the heavy burden which that standard imposes upon the allegedly defamed plaintiff. *See, e. g.,* Thompson v. Evening Star Newspaper Company, 129 U.S.App.D.C. 299, 394 F.2d 774, 776, cert. denied, 393 U.S. 884, 89 S.Ct. 194, 21 L.Ed. 2d 160 (1968), where we held that the plaintiff could not survive a motion for summary judgment and get to the jury on the issue of malice "unless he makes some showing . . . of facts from which malice may be inferred . . . "

the guarantee of a free press." The court went on to conclude that "[I]f an additional First Amendment liberty—the freedom of the press—is here involved, we do not hesitate to conclude that it too must give place under the Constitution to a paramount public interest in the fair administration of justice." [4]

In striking the constitutional balance contemplated in *Garland*, it could perhaps be argued that, although the *Sullivan* decision did not eliminate civil libel suits entirely, it has so downgraded their social importance that a plaintiff's interest in pressing such a claim can rarely, if ever, outweigh a newsman's interest in protecting his sources. The tenor of the Court's opinion in *Sullivan*

may be thought to reflect an attitude toward libel actions palpably different from its approach to grand jury proceedings in *Branzburg*. There is, however, the matter of the Court's continuing post-*Sullivan* citations of *Garland*.[5] This strongly suggests the continuing vitality of the latter case, and negates any inference that the Court does not consider the interest of the defamed plaintiff an important one.

*Branzburg's* lengthy discussion of a newsman's duty to testify before a grand jury undoubtedly has implications with respect to the deference to be accorded a newsman's claim of privilege in other areas as well. Although the differences between civil and criminal proceedings distinguish *Branzburg* from

4. Over and above the claim that the First Amendment without more barred the compelled disclosure of the confidential sources of newsmen, it was urged upon the court in *Garland* that it should recognize, apart from the Constitution, a societal interest in the unrestricted flow of news by throwing the protection of at least a qualified privilege over the identity of the news source. Noting a threshold question as to whether in this diversity case New York law governed, the court found no such privilege there provided under New York law, and it rejected the non-statutory privilege sought as one which "would poorly serve the cause of justice."

It was, lastly, argued in *Garland* that the district judge should, on the precise circumstances before him, have exercised his discretion under Rule 30 to protect the news source. In this regard it was suggested that the plaintiff Garland "might be able to acquire the information somewhere else", and that the claim was of such doubtful value on its merits that compulsion of the testimony would be no use. As to the first of these, the court noted that, while it was possible that the plaintiff might have learned the identity from further discovery proceedings against CBS, "her reasonable efforts in that direction had met with singular lack of success." As to the second, the court found itself unable to say that the claim was frivolous, especially since the information sought was of obvious materiality and relevance to its establishment.

5. In United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), Justice Stewart, writing for the Court, referred to *Branzburg* in these terms (pp. 8–9, 93 S.Ct. at p. 769):

These are recent reaffirmations of the historically grounded obligation of every person to appear and give his evidence before the grand jury. "The personal sacrifice involved is a part of the necessary contribution of the individual to the welfare of the public." Blair v. United States, 250 U.S. 273, 281 [39 S.Ct. 468, 471, 63 L.Ed. 979]. See also Garland v. Torre [2 Cir.], 259 F.2d 545, 549.

. . .

In Justice Marshall's dissenting opinion in that case (410 U.S. p. 41, 93 S.Ct. 764, 35 L.Ed.2d 67), *Garland* is cited, along with *Branzburg* and other Supreme Court cases, as suggesting that compulsions to testify are limited to personal testimony as distinct from voice exemplars.

In *Branzburg* itself, *Garland* was cited in Mr. Justice White's opinion for the Court as follows (408 U.S. at p. 686, 92 S.Ct. at p. 2659):

. . . In 1958, a news gatherer asserted for the first time that the First Amendment exempted confidential information from public disclosure pursuant to a subpoena issued in a civil suit, Garland v. Torre, 259 F.2d 545 (CA2), cert. denied, 358 U.S. 910 [79 S.Ct. 237, 3 L.Ed. 2d 231] (1958), but the claim was denied, and this argument has been almost uniformly rejected since then although there are occasional dicta that, in circumstances not presented here, a newsman might be excused. . . .

It also appears in Justice Stewart's dissent (408 U.S. at p. 743 n. 33, 92 S.Ct. at p. 2681), which was joined in by Justices Douglas and Marshall, as turning upon the finding that the information sought "went to the heart of the plaintiff's claim."

the case before us,[6] we cannot ignore the fact that the interests asserted by the newsmen in the *Branzburg* trilogy of cases were not accorded determinative weight by five members of the Court.

Although these cases provide some guidance as to the importance to be assigned to each of the competing interests, they do not seem to disturb the basic balancing approach set forth in *Garland*. Indeed, the *Branzburg* result appears to have been controlled by the vote of Justice Powell.[7] His concurring opinion states:

> The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions. (Footnote omitted). 408 U.S. at 710, 92 S.Ct. at 2671.

Hopefully anticipating a different result in *Branzburg*, appellant was content to present the case to us upon the theory that the First Amendment left no room, under any circumstances, for compelling a newsman to identify his source. That is clearly not the law after *Branzburg* with respect to criminal proceedings, and it appears to us that *Branzburg*, in language if not in holding, left intact, insofar as civil litigation is concerned, the approach taken in *Garland*. That approach essentially is that the court will look to the facts on a case-by-case basis in the course of weighing the need for the testimony in question against the claims of the newsman that the public's right to know is impaired.[8]

### III

Turning to the facts of the case before us, the information sought appears to go to the heart of appellee's libel action, certainly the most important factor in *Garland*.[9] It would be exceedingly

---

6. *Branzburg* was decided after this case was taken under submission, thereby disappointing the high hopes entertained for it by appellant and pressed strongly in both the District Court and on appeal, especially with respect to the Ninth Circuit decision in United States v. Caldwell, 434 F.2d 1081, which was reversed in *Branzburg*. Although it is certainly necessary to consider carefully the emphasis in *Branzburg* upon the public interest in the giving of testimony, we do not believe that it automatically controls this case. This is a civil libel suit rather than a grand jury inquiry into crime, and the dispute over disclosure is between the press and a private litigant rather than between the press and the Government. This difference is of some importance, since the central thrust of Justice White's opinion for the Court concerns the traditional importance of grand juries and the strong public interest in effective enforcement of the criminal law. Justice White also relied on the various procedures available to prosecutors and grand juries to protect informants and on careful use by the Government of the power to compel testimony. Private litigants are not similarly charged with the public interest and may be more prone to seek wholesale and indiscriminate disclosure.

7. *See* United States v. Liddy, 155 U.S.App. D.C. 382, 478 F.2d 586 (1972) (Leventhal, J., concurring).

8. There are no federal statutes embodying a testimonial privilege for newsmen, nor has Congress made any special provision on this score for the District of Columbia. Although the elements of diversity jurisdiction may be present in this case, it would appear that jurisdiction was considered as attaching in the District Court under the then applicable provisions of the D.C.Code.

9. This element serves to distinguish Baker v. F & F Investment, 470 F.2d 778 (2d Cir. 1972). That case involved a federal class action pending in Illinois alleging racial discrimination over a prolonged period in the sale of houses in Chicago on the part of some 60 realtors named as defendants. Plaintiffs in that suit went into the Southern District of New York for an order under Rule 37, Fed.R.Civ.P., to compel a journalist, who had since moved to New York, to disclose the identity of one Chicago real estate agent whose "block-busting" techniques had been the basis of a magazine article 10 years earlier by the journalist. Emphasizing that the information sought, although perhaps relevant, was simply not central to the plaintiff's case, the Second Circuit distin-

difficult for appellee to introduce evidence byond his own testimony to prove that he did not, at any time of day or night over an indefinite period of several weeks, remove boxfuls of documents from the UMW offices. Even if he did prove that the statements were false, *Sullivan* also requires a showing of malice or reckless disregard of the truth. That further step might be achieved by proof that appellant in fact had no reliable sources, that he misrepresented the reports of his sources, or that reliance upon those particular sources was reckless.[10]

Knowledge of the identity of the alleged sources would logically be an initial element in the proof of any of such circumstances. Although it might be possible to submit the question of malice to the jury simply on the basis of the conflicting allegations of the parties, that procedure would seem to provide the plaintiff little prospect of success in view of his heavy burden of proof.[11] Consequently, we find that the identity of appellant's sources is critical to appellee's claim.

In *Garland* the court was unable to say that the plaintiff's claim was frivolous. Neither can we conclude on the basis of the record before us that appellee's claim is without merit. In that respect this case is distinguishable from Cervantes v. Time, Inc., 464 F.2d 986 (8th Cir. 1972), which involved a libel action by the Mayor of St. Louis against *Life* magazine. After a prolonged and detailed investigation, *Life* published an article representing that the Mayor had maintained business and social ties with organized crime. Although the article consisted of 87 paragraphs generally containing statements detrimental to the Mayor's public image, his complaint challenged only four of those paragraphs, while the truth of the rest was either admitted or not expressly denied.

The Mayor sought by deposition to discover confidential sources upon whom *Life* had relied for part of the story. The defendant publisher refused to disclose that information and countered with a motion for summary judgment. That motion was accompanied by extensive affidavits detailing the prolonged and careful research, and numerous other sources, both public and private, upon which the article was based. The court granted summary judgment for the defendant on the ground that, regardless of the identity of the confidential sources, the plaintiff would be unable to establish malice. It reasoned that the extensive documentation and uncontroverted accuracy of the bulk of the article, combined with the evidence as to the prolonged, careful, and comprehensive nature of the defendant's investigation, made it so unlikely that the plaintiff could succeed in his suit that compulsory disclosure of the confidential sources was unwarranted.

There has, of course, been no motion by appellant for summary judgment in the case before us, and thus no showing of facts bearing upon the likelihood that appellee will be able to meet the *Sullivan* standard. The present pre-trial record, in any event, discloses no wide-ranging and thorough investigatory effort by appellant comparable to that demonstrated in *Cervantes*. Aside from the confirmation of the burglary report, his description of appellee's actions appears to have been based solely on the confidential sources in question. In *Cervantes* the article had been prepared over a period

---

guished *Garland* as involving "facts wholly unlike those before us", and upheld the District Court's determination that the newsman need not disclose his source. The court, rejecting a First Amendment claim of absolute privilege, asserted that the only question before it was whether, on the immediate facts, the District Judge had abused the wide discretion vested in him to dispose of motions under Rule 37.

10. As regards this last possibility, *see* Curtis Publishing Co. v. Butts, note 3 *supra*.

11. Indeed, it is at best questionable whether a jury would ordinarily be permitted to infer malice from so little evidence. *See* Afro-American Publishing Co. v. Jaffe, 125 U.S. App.D.C. 70, 366 F.2d 649 (1966) (*en banc*).

of several months by numerous people who had "spent countless hours corroborating and evaluating this data." 464 F.2d at 994. In contrast to that procedure, after appellant attempted unsuccessfully to reach appellee by one telephone call, he went ahead with publication immediately without waiting even one day to attempt to obtain appellee's comments. Further, his only action when appellee denied the story was to publish that denial along with a refusal to retract.[12]

We do not, of course, mean to intimate any opinion as to whether appellant's investigation was in fact adequate, or whether appellee will ultimately prevail. We say only that the facts disclosed by the record before us at this time are inadequate to support a conclusion that appellee is so unlikely to meet the admittedly heavy *Sullivan* burden that no purpose would be served by disclosure of the identity of the sources.

There is, finally, the matter of the possible availability of the information in question from someone other than appellant. The values resident in the protection of the confidential sources of newsmen certainly point towards compelled disclosure from the newsman himself as normally the end, and not the beginning, of the inquiry. In *Garland* the court took into account the fact the plaintiff had deposed three CBS executives without success before turning to Torre. In *Baker*, note 9 *supra*, the district court, in exercising its discretion to deny compelled revelation by the writer, had found that there were other sources that might have disclosed the true name of the pseudonymous informant.

Our information on this score is confined to what appears in appellant's deposition. There appellant testified that the eyewitnesses were all employees of UMWA. When asked as to their number, this colloquy occurred:

THE WITNESS: There is one that I know of personally and I understand that there were others.

BY MR. FORESTER:

Q. Others being at least two more that we are talking about?

A. At least one more.

As to the time when the observations occurred, appellant testified that his understanding was that "this was something that had been done over a period of time, more than one occasion;" and he was unable to give any idea of the number of such occasions because his sources had not been specific about that. Appellant stated his understanding to be that the observations occurred in the daytime during normal working hours, but he was unable to say precisely where in the building they took place.

We think it may be assumed that the national offices of the UMWA are manned by a very substantial number of employees. It is also clear from the foregoing that the observations in question could have been made by anyone from an office boy to a top officer, and in any part of the building. We do not think that the concept of exhaustion of remedies relevant here is invoked by guide marks as vague as these. Appel-

12. In Curtis Publishing Co. v. Butts, note 3 *supra*, Justice Harlan, in extending *Sullivan* to reach public figures as well as public officials, expressed concern (388 U.S. at p. 135, 87 S.Ct. at p. 1981) "lest the [*Sullivan*] rule become a talisman which gives the press constitutionally adequate protection only in a limited field, or, what would be equally unfortunate, one which goes far to immunize the press from having to make just reparation for the infliction of needless injury upon honor and reputation through false publication." His formulation (p. 155, 87 S.Ct. at p. 1991) was that "a 'public figure' who is not a public official may also recover damages . . . on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers . . ." In affirming the award of damages to Butts, the Court stressed the sketchiness of the investigation made prior to publication. Indeed, Chief Justice Warren, concurring in *Butts*, 388 U.S. at 169–170, 87 S.Ct. at p. 1999, commented "that little investigative effort was expended initially, and no additional inquiries were made even after" protest against and denial of the defamatory matter.

lant's own information as to the circumstances of the observations was so imprecise as to afford appellee no reasonable basis to know where to begin.

These facts are quite unlike those in *Garland*, where the plaintiff testified in a deposition that she did not know who the CBS "network executive" was who was referred to in Torre's column, but she had been told that it was "either Lester Gottlieb or Hubbell Robinson." [13] Neither does this record appear to be like that in *Baker* where there were some sixty defendant real estate agents charged with certain discriminatory practices, and the informant was described as a real estate agent himself who had engaged in the same practices at the same place at the same time; the court obviously saw no reason why the defendants themselves could not be deposed for the same information.

The courts must always be alert to the possibilities of limiting impingements upon press freedom to the minimum; and one way of doing so is to make compelled disclosure by a journalist a last resort after pursuit of other opportunities has failed. But neither must litgants be made to carry wide-ranging and onerous discovery burdens where the path is as ill-lighted as that emerging from appellant's deposition.

### IV

It is important to remember that this matter is before us on an appeal from an order of the District Court overruling an objection to that part of the pretrial examiner's recommendation that appellee's Rule 37 motion be granted and that appellant, "either on further deposition or in writing, identify the 'eye-witnesses' referred to by him . . ." Before discovery began, appellant had filed an answer denying liability. There have been no other proceedings thus far by way of motion for judgment or otherwise, and of course there has been no trial.

What we have decided—and all that we have decided—is that the District Court cannot, on the limited record before us, be said to have abused the discretion vested in it to grant or to deny a motion to compel discovery under Rule 37. We have rejected the only contention made to us by appellant, and that was the pre-*Branzburg* claim that there either is, or should be, an absolute First Amendment barrier to the compelled disclosure by a newsman of his confidential sources under any circumstances. That was not, in our view, the law before *Branzburg*, and it is certainly not the law after, in either civil or criminal proceedings.

Affirmed.

MacKINNON, Circuit Judge (concurring):

I concur in the foregoing opinion but wish to add some additional reflections on the practical result if appellant's claim were to be sustained.

In recent decisions the Supreme Court has substantially changed the longstanding libel law of this nation so as to make newspapers, broadcast stations and all others immune from civil or criminal responsibility for libelous statements against public figures unless the statements are made maliciously, *i. e.*, "with knowledge of their falsity or in reckless disregard of whether they are true or false." Garrison v. Louisiana, 379 U.S. 64, 78, 85 S.Ct. 209, 217, 13 L.Ed.2d 125 (1964); New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The news media has been quick to take advantage of this new-found freedom and since the decision in *New York Times, supra,* the nation has witnessed an enormous expansion in the publication of articles and statements that under prior law would have subjected the publishers to liability for libelous defamation. This development in the law also comes at a time when the speed of electronic communication has greatly

---

13. These two persons were deposed by plaintiff Garland, as was later a third CBS executive presumably working in the same area of network operations.

increased and a growing concentration has developed in the ownership, power and influence of the news media.[1] This, coupled with the existence of widespread electronic communication networks, vests a relatively small number of people with the ability within a few minutes to blanket the nation with statements that for the prior 200 years were held to be actionable libel. This is an enormous power.

In this case we are requested by appellant, a news reporter, to decide that the news media in effect possesses virtually absolute immunity from liability for libel. This would result if those employed by the news media were freed from the obligation to testify as to their sources, or alleged sources, of their libelous publications. If that were the law, the reporters and their employers (newspapers and broadcast stations) could as a practical matter in most cases never be held accountable for the serious injuries they cause. In cases where recovery is justified the amount of damage, which depends upon the degree of malice, would be much more difficult, if not impossible, properly to assess where the reliability or existence of an alleged informant is unknown and unknowable. The appellant, Britt Hume, admitted as much in an article of his published in *The New York Times Magazine,* December 17, 1972:

> Yet Carey has a point. If newsmen can refuse to name the source of defamatory stories, they can effectively vitiate what is left of the libel laws [after New York Times v. Sullivan] by hiding behind anonymous sources whenever sued.

The logic of that statement by Hume disposes of his argument in this case and should dispose of any claim for a reporter's immunity if the law is to be fair to the general public. If the law were otherwise, an injured plaintiff attempting to prove his case would face a blank wall, with practically no opportunity to discover the identity of the alleged source upon which the defense claims reliance.

If media publishers of defamatory material were to be given immunity from disclosing their sources, public figures would be greatly restricted, if not prevented, from recovering their damages, *cf.* Goldwater v. Ginzburg, 414 F. 2d 324 (2d Cir. 1969), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970),[2] but more importantly, *private individuals would be equally prevented from securing fair compensation for their injury* because the immunity of the reporter from disclosing his alleged news source would apply to all suits whether the injured person was a public figure or a private citizen. This immunity would also inure to the benefit of the reporter's employer, the newspapers and news media.

In my view such immunity from practically all responsibility for libelous publications by the news media, constituting, as it would, a substantial departure from previously well settled law, would be contrary to the public interest and not conducive to a responsible press. The news media must be free but it should also be responsible. To hold that it is responsible to the same extent as all other citizens are responsible for libelous publications, with the additional freedom recognized in *New York Times,* does not amount to an infringement on the constitutional guarantee of free speech and the freedom of the press. *Cf.* Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

In my view the constitutional grant of "freedom . . . of the press" does not convey an absolute immunity to the press to publish libelous information that it receives and then protect itself and the source by exercising a privilege

---

1. 99.8 per cent of the homes of America have radio and television sets. Statistical Abstract of the United States, 1972, at 691. In addition, in 1971 newspapers had a daily paid circulation that reached 62,108,000 homes. *Id.* at 501.

2. A frequent response to questioning as to sources would be that given by the defendant in *Ginzburg, supra:* "I don't recall who I had in mind when I wrote that statement." 414 F.2d at 332.

that prevents the victim from proving the malicious intent of the source or publisher. The constitutional privilege contemplates a responsible press. To grant the media what as a practical matter amounts to absolute immunity—absolute privilege—would tend to lead to irresponsible journalism which would be, to paraphrase Walter Lippmann, "corrupting to the whole journalistic process." [3] I accordingly concur in the foregoing opinion because I believe it to be a correct statement of the law and sound public policy as well.

3. Walter Lippmann commented as follows in an interview on the general subject of the responsibility of the press:

Q: There's been a great concern over the freedom of the press recently—the right of newsmen to protect their sources, the effort of the government to intimidate the media. You've been concerned with this problem throughout your career. Do you think there is a serious threat to freedom of the press?

A: [By Walter Lippmann] I think that very often troubles of the press come from a commercialized desire to get scoops, to be the first to print the news. These "sources" very often are places to get tips of what's going to happen. *The desire of newspapers to be the first to print particular information is corrupting to the whole journalistic process.* In the journalistic world I grew up in, it wasn't a question of law whether you had to divulge your sources. It was a question of whether the reporter had the guts to refuse to reveal where he got the information, whether he was willing to go to prison if necessary. That was regarded as the elementary code of a newspaper man. The reverse of that was—and this was always my practice—when someone told me something in confidence, I didn't pass it on to the reporters so we could get a scoop. I had a relationship with the man I was interviewing and I didn't want to print that.

Washington Post, March 25, 1973 (emphasis added).