**Wen Ho LEE, Appellee**

v.

**DEPARTMENT OF JUSTICE, et al., Appellees**

**Jeff Gerth, Appellant.**

No. 04–5301, 04–5302, 04–5321, 04–5322, 04–5323.

United States Court of Appeals, District of Columbia Circuit.

Argued May 9, 2005.

Decided June 28, 2005.

Floyd Abrams argued the cause for appellant Jeff Gerth and James Risen. With him on the briefs was Joel Kurtzberg.

Lee Levine argued the cause for appellant H. Josef Hebert and Bob Drogin. With him on the briefs were Nathan E. Siegel, Chad R. Bowman, and David A. Schulz. Seth D. Berlin entered an appearance.

Charles D. Tobin argued the cause for appellant Pierre Thomas. With him on the briefs was Ethan Arenson.

Paul M. Smith, Katherine A. Fallow, Lucy A. Dalglish, and Gregg P. Leslie were on the brief for amici curiae Maga-

zine Publishers of America, Inc., et al. in support of appellants urging reversal. Kevin Hardy and Kevin T. Baine entered appearances.

Brian A. Sun argued the cause for appellee. With him on the brief were Betsy A. Miller, Christopher Lovrien, David J. Schenck, and David L. Horan.

Mark A. Grannis and Thomas G. Connolly were on the brief for amicus curiae Steven J. Hatfill in support of appellee.

Before: SENTELLE, RANDOLPH and ROGERS, Circuit Judges.

SENTELLE, Circuit Judge.

Five journalists appeal a District Court order holding them in contempt of court for refusing to answer questions regarding confidential sources in a non-party deposition in a civil case. They contend that the District Court improperly applied our precedent in *Zerilli v. Smith*, 656 F.2d 705 (D.C.Cir.1981), to overcome a journalist's qualified privilege to keep sources confidential. We hold that the District Court did not abuse its discretion in holding four of the five journalists in contempt and therefore affirm as to four of the Appellants. Because there was insufficient evidence to hold Appellant Jeff Gerth in contempt we reverse the District Court's order as to him.

## I. Background

### *The Lee Investigation*

Appellee Dr. Wen Ho Lee is a scientist who was employed by the Department of Energy ("DOE") between 1978 and 1999. From 1996–1999 Lee was investigated by the DOE and the Federal Bureau of Investigation ("FBI") on suspicion of espionage on behalf of the People's Republic of China. Ultimately the government indicted Lee on 59 counts of mishandling of classified computer files. The case was resolved

through a plea agreement in which the government dismissed 58 counts of mishandling and Lee pleaded guilty to one count.

Shortly after his indictment, Lee filed a Privacy Act action against the DOE, the Department of Justice ("DOJ"), and the FBI alleging that each of the defendant agencies of the government had improperly disclosed personal information about Lee and about the investigation to members of the news media. The Privacy Act provides a private right of action against a government agency when records pertaining to an individual have been improperly disclosed by that agency. 5 U.S.C. § 552a. When a court finds that an agency made such a disclosure "in a manner which was intentional or willful," the United States is liable for damages plus attorneys' fees and costs. *Id.* § 552a(g)(4).

The investigation was first disclosed in the Wall Street Journal on January 7, 1999, followed by the Washington Post on February 17. The authors of these articles are not involved in this appeal. On March 6, Appellants Jeff Gerth and James Risen published an article in the New York Times ("Times"). The Times article did not identify Lee by name, but referred to a Chinese–American computer scientist working in nuclear weapons at Los Alamos and provided considerable detail about the nature and scope of the government's investigation.

Some network news stations broadcast Lee's name on March 8, immediately after which Appellant Josef Hebert wrote an article for the Associated Press revealing Lee's name. On March 9 the Times published another article by Risen that named Lee and described a lie detector test he had been given that indicated deception. On the same day the Los Angeles Times published an article by Appellant Bob Dro-

gin that provided details about the investigation that were particular to Lee, but did not include his name. On March 14, Drogin identified Lee by name in an article about the investigation.

The government's investigation eventually shifted from espionage to mishandling of computer files. This shift was reported on April 28, 1999, in a Times article authored by Risen with assistance from Gerth that cited anonymous government sources and included allegations that Lee had mishandled computer codes for nuclear weapons by downloading them to an unsecured computer. Appellant Pierre Thomas wrote a similar article published by CNN the same day giving Lee's name and information about the new investigative focus. On April 29 Drogin published an article quoting an unnamed government source who predicted that Lee would be arrested by the FBI "within 10 days."

### The Privacy Act Case

Lee brought suit against the DOE, the FBI, and the DOJ on December 20, 1999, alleging unlawful disclosures by employees of the defendant agencies designed to prejudice Lee's image and distract from the agencies' own security breaches. He claimed that the leaked information included his and his wife's employment history, their financial transactions, details of their trips to Hong Kong and China, details of the investigation and interrogation of Lee, and purported results of polygraph tests, all of which were disclosed in the press and should have been part of personnel or classified records. Lee requested damages of at least $1,000 for each violation of the Privacy Act together with reasonable attorneys' fees and costs.

Discovery in the Privacy Act case began on July 31, 2001. Lee made at least 420 written discovery requests to the government defendants, but was largely rebuffed by assertions of law enforcement privilege and learned nothing identifying the source of the leaks. Lee began deposing witnesses in October of 2001, focusing on individuals identified by the government's responses to interrogatories as those likely to have relevant information. He deposed six DOE employees including former Secretary of Energy Bill Richardson, Acting Director of DOE Intelligence and Counterintelligence Notra Trulock (who had allegedly told *60 Minutes* that he had "reached out to the *New York Times*," but retracted this statement in deposition), and Edward Curran, former director of the DOE Office of Counterintelligence. These three individuals in particular had been identified as likely sources of the leaks, but were unable (or unwilling) to identify the leaker(s). Lee also deposed six DOJ and eight FBI officials, but was unable to locate the source of the leaks.

In August of 2001 Lee issued subpoenas to Appellants Risen, Gerth, Drogin, Hebert, and Thomas seeking testimony and documents relating to the leaks, reasoning that his other discovery attempts had produced and would continue to produce no results. Each of the journalists objected and moved to quash the subpoenas. On October 9, 2003, the District Court denied the motions to quash and ordered the journalists to appear for the depositions and "truthfully answer questions as to the identity of any officer or agent of defendants, or any of them, who provided information to them directly about Wen Ho Lee, and as to the nature of the information so provided." Joint Appendix ("J.A.") at 1257 ("Discovery Order").

The court based its conclusion on the governing precedent of *Zerilli v. Smith*, 656 F.2d 705 (D.C.Cir.1981), a case that laid out guidelines for balancing First Amendment interests with a litigant's need for information when a plaintiff seeks to

subpoena a non-party journalist in the context of a civil action.[1] *Zerilli* set out two guidelines to determine when a plaintiff may compel a non-party journalist to testify to the identity of his confidential sources. First, the information sought must go to "the heart of the matter" and not be merely marginally relevant. 656 F.2d at 713. Second, the plaintiff must have exhausted "every reasonable alternative source of information" so that journalists are not simply a default source of information for plaintiffs. *Id.* The District Court found that Lee had met both of these guidelines to overcome the journalists' qualified privilege. The court held that the information was clearly central to the case. It held that Lee had exhausted all reasonable alternatives because the depositions showed a pattern of evasion and stonewalling and because Lee used the five principal tactical devices given in the Federal Rules of Civil Procedure including analyzing responses to factual allegations in the answer to the complaint, requests for documents under Fed.R.Civ.P. 34, use of interrogatories under Fed.R.Civ.P. 33, requests for admissions under Fed. R.Civ.P. 36, and depositions under Fed. R.Civ.P. 30(b)(1) and (b)(5). The court also noted that Lee's actions were essentially the equivalent of a Rule 30(b)(6) deposition.

After the journalists had been deposed and refused to answer certain questions, the District Court held them in contempt, refused to reconsider its holding on the privilege issue, and fined each $500 per day, to be stayed pending appeal. J.A. at 2275–86 ("Contempt Order"). These consolidated appeals followed.

## II. Analysis

In both the District Court and before us, Appellants rely on the theory that the First Amendment and federal common law create a privilege that protects the right of a journalist to conceal confidential sources of information in the face of otherwise legitimate compulsion of testimony in federal courts.[2] Not only the breadth of this claimed privilege, but its very existence has long been the subject of substantial controversy. In *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Supreme Court considered a claim of such a privilege in the context of reporters' refusal to reveal the identity of confidential sources in a grand jury investigation. Each of the reporters in *Branzburg* had been held in contempt for refusing to disclose the identity of informants or the nature of the information given him in confidence. The Supreme Court flatly rejected the existence of any such constitutional privilege, stating that "the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self-incrimination." *Id.* at 689–90, 92 S.Ct. 2646. The Supreme Court then expressly refused "to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy." *Id.* at 690, 92 S.Ct. 2646.

---

1. *Zerilli* also suggests that
   [a] distinction can also be drawn between civil cases in which the reporter is a party, as in a libel action, and cases in which the reporter is not a party. When the journalist is a party, and successful assertion of the privilege will effectively shield him from liability, the equities weigh somewhat more heavily in favor of disclosure.

656 F.2d at 714. Because all the journalists in this case are non-parties, we need not deal with this distinction.

2. Because the federal common law claim was not a basis for the District Court's decision and was scarcely raised on appeal, appearing only in one footnote in one of the journalists' briefs, we will not address this issue.

While some would read the absolute language of the Supreme Court as foreclosing the possibility of any such privilege under any circumstance, our court, among others, has limited the applicability of the *Branzburg* precedent to the circumstances considered by the court in *Branzburg*—that is, the context of a criminal proceeding, or even more specifically, a grand jury subpoena. In *Carey v. Hume*, 492 F.2d 631 (D.C.Cir.1974), a libel case, we upheld a District Court order compelling a journalist "either on further deposition or in writing [to] identify the 'eyewitnesses' referred to by him . . ." in a publication underlying the proceeding. *Id.* at 639. However, we did so with at least the suggestion that some such privilege might survive *Branzburg* in the context of a civil action. Notably, we rejected the possibility "that there either is, or should be, an *absolute* First Amendment barrier to the compelled disclosure by a newsman of his confidential sources under any circumstances." *Id.* (emphasis added). A few years later, in *Zerilli*, we actually held that despite *Branzburg* there is a reporter's privilege in civil actions, and that "in the ordinary case the civil litigant's interest in disclosure should yield to the journalist's privilege." 656 F.2d at 712. But *Zerilli*, like *Carey*, made it plain that any such privilege is qualified, not absolute. That brings us to the question whether the District Court in this case complied with the guidelines of *Zerilli* before holding Appellants in contempt.

■ The parties dispute the proper standard of review. Lee argues that both the Discovery Order and the Contempt Order should be reviewed for abuse of discretion because *Zerilli*, 656 F.2d at 710, and *Carey*, 492 F.2d at 639, applied this standard in reviewing determinations of journalist privilege. In *Zerilli*, we upheld a refusal to compel testimony by journalists in a Privacy Act suit, while in *Carey* this Court upheld an order directing journalists to testify regarding sources in a libel suit.

The Appellant journalists argue that we should review the order *de novo*. They base this argument principally on Supreme Court language in *Bose v. Consumers Union of United States*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), in which the Supreme Court analyzed the "independent review" duty of courts in certain First Amendment cases drawn from *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). More specifically, the *Bose* Court stated that "in cases raising First Amendment issues we have repeatedly held that an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.' " *Bose*, 466 U.S. at 499, 104 S.Ct. 1949 (quoting *New York Times*, 376 U.S. at 284–86, 84 S.Ct. 710). We find the precedent of *Bose* inapplicable for a number of reasons. First, this case does not involve a claim of "forbidden intrusion on the field of free expression." There is no suggestion that the court or any branch of government in any fashion attempted to interfere with or now attempts to interfere with the Appellant journalists' right to print or communicate anything they choose. Both *New York Times* and *Bose* were libel cases in which a judgment of the court stood to "punish" or at least adversely affect the litigants based upon the exercise of their free expression. No such threat exists here.

Furthermore, what we are reviewing is a discovery order, not the final judgment. In *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984), a case decided one month after

*Bose,* the Supreme Court itself made plain that no "heightened First Amendment scrutiny" applied to discovery orders. *Id.* at 36 n. 23, 104 S.Ct. 2199. As the Supreme Court stated in *Seattle Times,* "[t]he trial court is in the best position to weigh fairly the competing needs and interests of parties affected by discovery." *Id.* at 36, 104 S.Ct. 2199.

▉ Further, in *Zerilli* itself, we noted that "the scope of review in this case is narrowly circumscribed." 656 F.2d at 710. As we stated in *Zerilli,* "[a] motion to compel discovery is committed to the discretion of the trial court, and our function on appeal is solely to determine whether the trial court abused its discretion in entering the challenged order." *Id.* Admittedly, the Supreme Court decided *Bose* after *Zerilli.* But *Bose* did not announce a new doctrine; indeed, the *Bose* Court made it plain that it was only clarifying the doctrine announced in *New York Times,* a decision well pre-dating *Zerilli.* Therefore, the precedent of *Zerilli* stands unshaken, and binds us to the standard of review set forth therein. The doctrine of independent review is applicable in cases like *Bose* and *Sullivan* where the merits of the underlying case are at issue and free expression claims are involved. This case, however, involves underlying discovery orders like those challenged in *Seattle Times, Zerilli* and *Carey.* Under the precedent of these cases we may review legal rulings of the trial court *de novo* but we will defer to the sound discretion of the trial court where the balancing of the relevant factors is involved.

Appellants requested permission from the District Court to appeal the Discovery Order directly but were not allowed to do so. They now appeal only the Contempt Order, but our review of that order logically includes a review of the underlying issue of whether the journalist's privilege ap-

plies in this case. *See United States v. Philip Morris USA, Inc.,* 396 F.3d 1190, 1195 (D.C.Cir.2005) (quoting *Yamaha Motor Corp., USA v. Calhoun,* 516 U.S. 199, 205, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996)) (we review issues directly in the certified order as well as those decided earlier in the case but "fairly included within the certified order"). Thus we first will review for abuse of discretion the Discovery Order's holding that the journalist's privilege does not protect Appellants. We then will determine whether the District Court abused its discretion in finding "clear and convincing evidence" that each reporter violated the Discovery Order. *Washington–Baltimore Newspaper Guild, Local 35 v. Washington Post Co.,* 626 F.2d 1029, 1031 (D.C.Cir.1980).

## A. The Discovery Order

▉ As we stated above, *Zerilli* provides for a non-party journalist's qualified privilege in a civil action such as this one, where testimony of journalists is sought because government officials have been accused of illegally providing the journalists with private information. *Zerilli* cites *Carey* for the two guidelines determining when a court can compel a non-party journalist to testify about a confidential source. First, the information sought must go to "the heart of the matter." 656 F.2d at 713 (quoting *Carey,* 492 F.2d at 636). Second, the litigant must exhaust "every reasonable alternative source of information." 656 F.2d at 713 (quoting *Carey,* 492 F.2d at 638). When applying this analysis, however, the court must keep in mind that this privilege is not absolute. The Supreme Court has noted in the context of privilege in grand jury cases that it "cannot seriously entertain the notion that the First Amendment protects a newsman's agreement to conceal the criminal conduct of his source, or evidence thereof, on the theory

that it is better to write about crime than to do something about it." *Branzburg*, 408 U.S. at 692, 92 S.Ct. 2646, *quoted in In re Grand Jury Subpoena, Judith Miller*, 397 F.3d 964, 970 (D.C.Cir.2005). The same principle applies here; the protections of the Privacy Act do not disappear when the illegally disclosed information is leaked to a journalist, no matter how newsworthy the government official may feel the information is. This does not leave journalists without protection. Besides the qualified privilege described in *Zerilli*, the usual requirements of relevance, need, and limited burdens on the subpoenaed person still apply. *See* Fed.R.Evid. 401, 403; Fed. R.Civ.P. 45(c)(1).

Applying the factors laid out in *Zerilli*, we find that the District Court did not abuse its discretion in requiring the journalists to testify. First, it is clear that the information Lee is seeking goes to the heart of his case. As in *Zerilli*, the relevant information is the identity of the individuals who may have leaked information in violation of the Privacy Act. If he cannot show the identities of the leakers, Lee's ability to show the other elements of the Privacy Act claim, such as willfulness and intent, will be compromised. The journalists have refused to reveal even the employer of their unidentified sources, information that arguably would have been sufficient to support at least a portion of Lee's claim.[3] The *Carey* court similarly observed that, while it might be possible to succeed without the identity of the parties in a libel claim where malice was required to be proven, success was very unlikely under such circumstances. 492 F.2d at 637. Several Appellants argue that their testimony would be duplicative if others are forced to testify, but this

argument fails both because each may have different sources and because such an argument could be used to excuse all journalists' testimony whenever there is a leak to more than one person.

Lee has also met his burden as to exhaustion. Some of the Appellants make an ingenious argument that "cases in both the Supreme Court and this Court ... have required parties to take upwards of 60–65 depositions before concluding that they satisfied the exhaustion requirement." Gerth and Risen Opening Br. at 25. Since Lee had taken only 20 or so depositions, those Appellants contend that the District Court could not properly have held that he had exhausted other avenues of discovery. For this proposition, Appellants Gerth and Risen cite *In re Roche*, 448 U.S. 1312, 1316, 101 S.Ct. 4, 65 L.Ed.2d 1103 (1980), which, according to Appellants' brief, stands for the proposition that "plaintiffs [are] required to depose 65 individuals before civil contempt proceeding[s] could proceed against [a] journalist for not revealing sources." Gerth and Risen Opening Br. at 25. This description of the *Roche* opinion is inaccurate to a point approaching deceptiveness. In the first place, *Roche* is not an opinion of the Supreme Court, it is an in-chambers opinion of a single justice granting a stay. In the second place, it did not require the litigant to depose 65 witnesses. The only mention of the number 65 is in reference to the number of witnesses a litigant had listed below. There is no reference to any required number of witnesses as being necessary to constitute exhaustion, and indeed, the in-chambers opinion did not discuss the concept of exhaustion at all.

Supporting the number 60, Appellants cite *Zerilli*, 656 F.2d at 714, for the propo-

---

**3.** The Court does not reach the issue of whether the journalist's qualified privilege includes the privilege to withhold information, including employment, that would not reveal the identity of a source.

sition that "the taking of as many as 60 depositions might be a reasonable prerequisite to compelled disclosure." That representation by appellants, while not as disingenuous as the description of *Roche,* is nonetheless misleading. The reference to 60 possible depositions is taken from *Carey* and occurs in a discussion of the distinction between *Carey* and the Second Circuit case *Baker v. F & F Investment,* 470 F.2d 778 (2d Cir.1972), a case in which there were 60 defendants whom the plaintiff had not deposed before seeking the testimony of a journalist. *See Carey,* 492 F.2d at 636 n. 9 & 639. Presumably, if there had been five defendants in *Baker,* the *Carey* Court would have referred to the five defendants; had there been one hundred, then one hundred. In no event is there any implication that a specific number of depositions is necessary to create exhaustion. Indeed, in addition to the reference to *Baker, Carey* also used as a benchmark the *three* CBS executives deposed by Garland in *Garland v. Torre,* 259 F.2d 545 (2d Cir. 1958), and concluded that where the plaintiff was only able to narrow the pool of possible leakers to the set of all employees in a large company he need not go beyond deposing the reporter *alone.* 492 F.2d at 638–39. In *Zerilli* itself exhaustion was found lacking because the plaintiff had deposed only the journalist and not the four individuals named by the Department of Justice as likely sources of the leak. 656 F.2d at 714–15.

In light of this precedent, the number of depositions necessary for exhaustion must be determined on a case-by-case basis. This seems to be precisely the type of case-specific determination that the District Court is best positioned to make, and the decision in this case is well within its discretion. While Lee did not depose every individual who conceivably could have leaked the information, *Carey* makes clear that this is not necessary. The lengthy list of possible deponents provided by Gerth and Risen and spanning six pages of their brief only accentuates the unreasonable burden of discovery they attempt to place on a plaintiff. This list essentially encompasses every individual who could have had any kind of access to the information regardless of other evidence that the deponents on whom Lee focused were in fact the sources of the leaks and were denying it. As the Court stated in *Carey,* "litigants [need not] be made to carry wide-ranging and onerous discovery burdens where the path is . . . ill-lighted." 492 F.2d at 639. Lee has done far more to exhaust alternatives than the plaintiff in *Zerilli* who did not meet his burden, and at least as much as the successful plaintiffs in *Garland* and *Carey.*

## B. The Contempt Order

In reviewing the Contempt Order we must consider whether the District Court abused its discretion in finding, as to each contemnor, "clear and convincing evidence" that he had violated the Discovery Order. *Washington–Baltimore Newspaper Guild,* 626 F.2d at 1031. The court ordered the journalists to appear for their depositions and ". . . if asked, truthfully [to] answer questions as to the identity of any officer or agent of defendants, or any of them, who provided information to them directly about Wen Ho Lee, and as to the nature of the information so provided . . . ." *See* Discovery Order at 17. As to Appellants Risen, Hebert, Drogin, and Thomas we find that the court did not abuse its discretion. As to Appellant Gerth we find too much ambiguity in the record to uphold a finding of contempt.

### James Risen

▮ The record on Appellant James Risen clearly presents sufficient evidence of contempt. He invoked the privilege at

least 115 times to avoid disclosing information including: (1) whether he had spoken to certain individuals at all; (2) the source of unattributed quotes in his articles, including whether they came from specific individuals; (3) further information clarifying the employers of unattributed sources, even when the articles listed them as officials in certain departments; (4) whether various individuals were close to the Lee investigation or would have had relevant information; (5) confirmation of information given by others in congressional testimony; (6) his general practice with respect to unattributed sourcing; (7) the identity of unattributed sources cited by his colleague, Jeff Gerth; (8) confirmation of calls placed to government officials by him from an FBI log; and (9) whether or not his testimony was intended to be inconclusive as to whether certain individuals were his sources.

While some of these invocations of privilege may have fallen outside the testimony compelled by the Discovery Order, many of them represent clear and convincing evidence that Risen violated the order. To give only a few examples, Risen refused to testify as to: whether Secretary Richardson disclosed Lee's identity or information about his interrogation or prosecution to Risen; whether Notra Trulock was correct in his testimony before Congress when he said that Secretary Richardson had leaked Lee's name to Risen; the name or employer of a source or sources that provided information about lie detector tests that a suspect (later revealed as Lee) was given; and the identity of sources who told Risen that Lee was suspected to have copied nuclear secrets onto tapes and removed them from the lab. Risen also stated that he intended, notwithstanding the Discovery Order, to refuse to divulge information about the identity of his confidential sources in the Lee case. This evidence is sufficient to uphold the District Court's determination that Risen was in contempt for violating the Discovery Order.

### Josef Hebert

■ There is clear and convincing evidence of record that Appellant Josef Hebert violated the Discovery Order. He invoked the privilege in response to 24 questions, refusing to disclose: (1) who he had bifurcated interviews with (i.e., interviews conducted partially on and partially off the record); (2) whether he spoke with FBI employees; (3) his typical practice of having bifurcated interviews; (4) whether he spoke with particular individuals; (5) what characterization was appropriate for various individuals with respect to the Wen Ho Lee case (e.g. who qualified as a "senior administration official"); (6) the names or employers of individuals who provided specific information used in his articles; and (7) whether various off-the-record sources were multiple individuals or the same individual. The District Court cited four questions that clearly were covered by the Discovery Order but that Hebert refused to answer. "whether he communicated with FBI employees, with DOE employee Ed Curran, with FBI employee Neil Gallagher, and whether his sources were employed by the government defendants." Contempt Order at 8 n. 8. Hebert does not attempt to argue that these questions were not encompassed by the Discovery Order and we agree that they were subject to the order. Thus we must uphold the District Court's holding of contempt.

### Bob Drogin

■ Appellant Bob Drogin only invoked the privilege eight times, but in at least one response clearly violated the Discovery Order and thus he was properly held in contempt. Drogin refused to answer questions about whether he talked with

Secretary Richardson concerning Lee in bifurcated interviews, who he conducted bifurcated interviews with regarding the Lee case, and whether his failure to quote an individual in an article indicated a lack of communication with him on a subject. He also gave many unresponsive answers to questions about sources for his articles, all involving variations on the wording: "to the degree that I quoted him in my articles, then I communicated with him." When asked about the sources of unattributed information in articles he had written, Drogin almost always stated that he did not recall the names of the sources and no evidence on the record contradicts his assertions. But in one case he invoked the privilege rather than reveal the name of the "senior Clinton Administration official" who provided information about FBI plans to arrest Lee on charges of leaking information to China and copying files onto an insecure computer. This clearly violates the Discovery Order's mandate to "answer questions as to the identity of any officer or agent of defendants, or any of them, who provided information to [him] directly about Wen Ho Lee." Discovery Order at 17. Drogin's own statement during the deposition confirmed that he did not intend to fully comply with the order: "I intend to be as cooperative as I possibly can within the constraints that I feel as a journalist to protect the identity of the sources to whom I have promised confidentiality. Thus we uphold the District Court's finding of contempt as to Drogin."

### Pierre Thomas

Appellant Pierre Thomas did not invoke the privilege frequently, but among his ten invocations of privilege he refused to answer questions clearly encompassed by the Discovery Order and thus we will uphold the Contempt Order as to Thomas. He refused to divulge whether he had bifurcated interviews with anyone in connection with these stories, whether he talked with FBI officials outside their official capacity, whether he spoke off-the-record with specific individuals, and the names or employers of sources of specific information. In particular, he refused to give the name or employer of the source of information about the removal of copies of files containing top secret nuclear information and the connection of Lee to these copies. He also refused to reveal the names or employers of the sources who gave information about the progress of the FBI investigation into Lee. During his deposition, Thomas confirmed that, notwithstanding the Discovery Order, he intended not to answer questions concerning his confidential sources. This evidence is plainly sufficient to support the District Court's holding of contempt.

### Jeff Gerth

■ Because Appellant Jeff Gerth never refused to answer questions directly covered by the Discovery Order and consistently professed ignorance of the identity of sources who provided information specifically about Lee, we reverse the District Court's holding of contempt as an abuse of its discretion. *See Armstrong v. Executive Office of the President, Office of Admin.*, 1 F.3d 1274, 1289 (D.C.Cir.1993) (holding that it is an abuse of discretion to hold someone in contempt who has not violated a clear court order). Gerth only invoked the privilege once during his 127-page deposition. Gerth stated that he did speak to off-the-record sources when reporting on the Wen Ho Lee case, defined by opposing counsel during Gerth's deposition as "any of the reporting [Gerth] did between January of 1999 and the end of 2000 that related to in any way subject matters that involved Dr. Lee, namely, his alleged mishandling of classified information at the Los Alamos lab, or allegations that he had divulged secrets regarding the

W–88 to the Chinese government." He refused, however, to disclose whether these sources included FBI employees.

Gerth argues, and we agree, that this definition of "the Wen Ho Lee case" was so broad that it encompassed information not included in the Discovery Order, including material from confidential sources in articles that referenced Wen Ho Lee but that was not personally related to Wen Ho Lee himself. Gerth had worked on articles that discussed investigations of both Wen Ho Lee and Peter Lee, and Gerth claims that he had done confidential reporting regarding Peter Lee only. He testified consistently in his deposition, and maintained in subsequent affidavits and briefing, that he did not know the identity of any sources who provided information specifically about Wen Ho Lee cited in the articles he co-authored with Risen.

The District Court refused to credit Gerth's assertions of ignorance but acknowledged that if he were telling the truth no order of contempt would be warranted. It cited his admission that he had used off-the-record sources in some articles as a contradiction of his claims that he did not know the identities of sources who gave information specifically about Lee. This is insufficient to provide "clear and convincing evidence" of contempt because of the question's breadth. The Discovery Order only compelled disclosure of sources who provided information "directly about Wen Ho Lee," not about the background of the case or related cases, even if they were tangentially related to Wen Ho Lee. While Gerth later did state that it was his "intention" not to divulge confidential sources used in connection with articles he worked on "between 1999 and 2000 that refer[ ] or make[ ] reference to Dr. Lee in any way," this also is too broad to provide "clear and convincing evidence" of violation of the Discovery Order because it could

cover material on other individuals used in articles that also referred to Wen Ho Lee.

## III. Conclusion

For the reasons given above we vacate the contempt order as to Appellant Jeff Gerth and uphold the order as to the remaining Appellants.