William P. TAVOULAREAS, et al., Plaintiffs,

v.

Philip PIRO, Defendant.

William P. TAVOULAREAS, et al., Plaintiffs,

v.

The WASHINGTON POST CO., et al., Defendants.

Civ. A. Nos. 80–2387, 80–3032.

United States District Court, District of Columbia.

Dec. 17, 1981.

See also, D.C. 93 F.R.D. 11; 93 F.R.D. 24.

John J. Walsh and Jerry Birenz, New York City, and Joseph A. Artabane, Washington, D.C., for plaintiffs.

David E. Kendall and Robert C. Post, Washington, D.C., for defendant Washington Post.

Stanley M. Brand, Gen. Counsel, and Steven R. Ross, Asst. Counsel to the Clerk, U.S. House of Representatives, Washington, D.C., for Congressional Deponents.

Joel M. Wolosky, New York City, for defendant Comnas.

David Machanic, Washington, D.C., for defendant Piro.

## MEMORANDUM

GASCH, District Judge.

Currently before the Court are two motions to compel discovery filed by plaintiffs and two cross-motions for protective orders filed by the defendants, The Washington Post Co., *et al., (The Post).* Because the scope of the dispute between the parties is great, the Court will attempt once again to issue broad guidelines by which discovery in this suit shall be conducted. In categorizing the information over which the parties disagree, and for the purpose of framing the issues to be resolved, the Court will employ the nomenclature used by counsel for *The Post* at the hearing on this matter. At that hearing, counsel for *The Post* referred to seven categories of information currently at issue: (1) confidential source information; (2) resource materials; (3) "unpublished" information; (4) documents in Sandy Golden's possession; (5) evidence of unrelated prior acts; (6) opinions of *The Post* as to journalistic standards; and (7) mental health information contained in defendants' personnel files at *The Post*. The parties have filed separate motions to compel and for a protective order with regard to these seven categories of information. In addition, the parties have filed a second set of discovery motions in which both sides dispute the right of plaintiffs to depose *The Post's* former ombudsman, William L. Green. Accordingly, the Court will discuss these eight discovery matters *seriatum* and will order that discovery be conducted in a manner consistent with the views expressed in this memorandum.[1]

---

1. The Court notes at the outset *The Post* de-    fendants' contention that this lawsuit is frivo-

I. *Plaintiffs' Motion to Compel Answers to Interrogatories and Production of Documents.*

   a. *Confidential Source Information.*

With respect to narrowly framing an issue to permit appropriate judicial resolution, the parties have been least successful with this category of information. From the papers, three subcategories of information appear to be encompassed within this broad category of documents: (1) information identifying the "author, addressee(s) (where applicable), recipient(s), (if any), date, number of pages, [and] subject matter" of any documents withheld by *The Post* on the basis of a confidential source objection, Plaintiffs' Second Request for the Production of Documents at 2, Instruction c [cited subsequently as Request II]; (2) any documents provided to *The Post* by the Dingell Committee and any communications between *The Post* defendants and the Dingell staff, Plaintiffs' First Set of Interrogatories ¶¶ 25, 30 [cited subsequently as Interrogatories I]; Plaintiffs' First Request for the Production of Documents ¶ 3 [cited subsequently as Request I]; and (3) "any expense vouchers, reimbursement requests, travel logs, diaries, or telephone bills related to or generated in the course of" *The Post* defendants' investigation of the subject matter of the allegedly libelous articles at issue in this case, Interrogatory I, ¶ 31; Request II, ¶ 1. Defendants have withheld the specified information or documents on the general ground that all these requests improperly seek to ascertain *The Post*'s confidential sources for the articles in question. Defendants note that this Court in a memorandum issued on September 10, 1981, specifically protected *The Post*'s confidential sources, at least until plaintiffs had exhausted any alternative means for acquiring this information. *See Tavoulareas v. Piro,* 93 F.R.D. 11, at 16–17 (D.D.C.1981) [cited subsequently as September 10th Memorandum]. By requesting materials that might be used to piece together the identities of off-the-record sources, defendants argue, plaintiffs are attempting to obtain indirectly information that this Court has ruled they are not yet entitled to through direct discovery.

Plaintiffs counter that their discovery requests seek only to ascertain the existence, not the identity, of any of *The Post*'s confidential sources. By excising the names of any off-the-record source from the documents requested, plaintiffs contend, defendants can assure the confidentiality of these sources without frustrating plaintiffs' legitimate need for discovery. Plaintiffs further argue that *The Post* defendants rely upon an overbroad claim of confidentiality to shield from disclosure numerous documents that are necessary to the preparation of plaintiffs' case. Plaintiffs find *The Post*'s objections particularly inappropriate in light of defendants' position that confidential sources played only a small role in confirming the veracity of statements contained in the two articles that form the basis of this suit. If off-the-record sources constituted only a minor role in the preparation of the two articles, plaintiffs reason, then defendants cannot logically claim that disclosure of most of the requested docu

---

lous and that, consequently, discovery by plaintiffs should be circumscribed to protect defendants from unwarranted harassment. At this juncture, however, the Court cannot say that this lawsuit is without merit, or that the plaintiffs' underlying purpose is simply to harass *The Post* for publishing articles plaintiffs find offensive. Rather, at this stage of the litigation, the Court expresses no view as to the ultimate merits of plaintiffs' cause of action. Because plaintiffs have not yet had the opportunity to explore adequately the facts surrounding the publication of the two articles in issue, the Court believes that the appropriate course of action, as with most litigation, is to permit full and complete discovery by both sides within the rather broad limits authorized by the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 26(b)(1); *Herbert v. Lando,* 73 F.R.D. 387, 394–95 (S.D.N.Y.1977), *aff'd,* 441 U.S. 153 [99 S.Ct. 1635, 60 L.Ed.2d 115] (1979) (*reversing* 568 F.2d 974 (2d Cir. 1977)); 4 *Moore's Federal Practice* ¶ 26.56[1], at 26–124 to –125, 26–131 to –135 (2d ed. 1981). The parties are therefore admonished to get on with the business of discovery and to avoid future disputes of this nature because the Court fully intends in the near future to set this action down for trial sometime in the spring of 1982.

ments would reveal the identity of confidential sources.

The Court considers this issue mindful of its decision, rendered only a few months ago, that *The Post* reporters' confidential sources are protected against compelled disclosure, at least until plaintiffs have exhausted alternative means of acquiring this information. *See* September 10th Memorandum at 16–17. Because the Court still adheres to the conclusion that disclosure of off-the-record sources is premature at this time, the issue that must be addressed is whether responses to plaintiffs' interrogatories and requests for production would reveal the identities of any of *The Post*'s sources that remain confidential to date. Consequently, the Court will next discuss each of the three subcategories of information that have been identified above as potentially falling within this broader category of confidential source materials.

*Documents Provided By, and Communications With, the Dingell Committee*

█ The Court approaches this class of information aware that plaintiffs are currently engaged in efforts to obtain at least some of this information directly from the Dingell Committee staff. Some of these efforts apparently have already borne fruit and led to the discovery of certain of *The Post*'s confidential Committee sources for the articles in question. *See* Deposition Transcript of Peter D.H. Stockton at 30 (November 16, 1981). To this extent, therefore, certain Dingell Committee sources, previously confidential, are no longer so. In view of these developments, the Court concludes that *The Post* can no longer rely on a confidential source argument to justify its refusal to respond to questions that pertain to individuals whose identities as sources have been established by the individuals themselves. With regard to these individuals, the Court will order *The Post* to furnish plaintiffs with the requested information or documents. With one narrow exception, however, *The Post* defendants may continue to withhold information regarding any confidential source whose identity has not yet been established through other independent means.

The narrow exception to which the Court has referred above concerns the *existence* of any other confidential sources used by *The Post* defendants in preparing or verifying the two articles in issue. To facilitate plaintiffs' independent search for other confidential sources, the Court will order *The Post* to disclose whether any confidential sources, other than those already known to plaintiffs, provided additional information used in the November 30 and December 1, 1979, articles. *The Post* defendants need only disclose the existence and number of any other off-the-record sources; they need not provide any identifying information about these sources, if any. The Court orders production of this limited information about as yet undisclosed confidential sources because, without this knowledge, plaintiffs would be unable to determine when they have exhausted their independent search for individuals relied upon by *The Post* in publishing the articles in question. If, on the one hand, for example, *The Post* indicates that three confidential sources remain as yet undisclosed, then plaintiffs will know that further inquiries of other individuals are necessary. If, on the other hand, *The Post* acknowledges that plaintiffs have uncovered the identities of all the off-the-record sources relied upon in the articles, then plaintiffs will know that their search for confidential sources is at an end and will be able to evaluate effectively the future course of their lawsuit. In sum, disclosure of the existence of any other confidential sources will expedite the ultimate resolution of this litigation.

*Travel Records, Telephone Bills, Expense Vouchers and Similar Materials*

█ At this time, the Court will deny plaintiffs' motion to compel the production of this kind of material for two reasons. First, as *The Post* defendants argue, this sort of information may lead plaintiffs to confidential sources which they are not entitled to obtain from defendants at this stage of the litigation. Second, the Court finds the materials sought of minimal relevance to any factual issue other than to the

discovery of confidential sources from *The Post*. Given both the minimal independent relevance and the burden that production would cause *The Post*, the Court will exercise its discretion and grant defendants protective relief as to this information, at least for the present.

*Information Identifying Documents or Other Materials Withheld by The Post Defendants on Grounds of Confidentiality* ·

Plaintiffs' second request for the production of documents contains an instruction that asks *The Post* defendants to identify any materials withheld by them. The instruction reads in full:

> If any defendant claims that any requested document is not subject to discovery by reason of privilege or otherwise, then such defendant is requested to identify the document according to the number(s) of the requests herein and in the interrogatories dated March 3, 1981 to which they relate, and to describe each such document by title, if any, present location, custodian, author, addressee(s) (where applicable), recipient(s) (if any), date, number of pages, subject matter, and location of any identical or non-identical copies known to defendant to be within the possession, custody, or control of any other person, and to set forth the nature of the claimed privilege or other ground for refusal to produce.

Request II, at 2, Instruction c. Plaintiffs claim this information is necessary to establish a record of the nature and existence of any confidential materials relied upon by *The Post* in publishing the two articles in issue. Defendants respond that production of this information is objectionable because the very nature of the data would reveal the identity of confidential sources that this Court previously has protected from disclosure.

In the Court's opinion, the issues raised by this dispute overlap those issues raised during the course of the Court's previous discussion of the Dingell Committee sources. *See* discussion, *supra* at 39–40. Consequently, the same guidelines established earlier in this memorandum will govern plaintiffs' right to compel a response to Instruction c. To the extent that a particular response to this instruction will not seriously threaten to divulge a source that to date remains confidential, defendants shall respond. To the extent, however, that *The Post* concludes in the exercise of good faith that a particular response may expose a source to whom the defendants have extended an assurance of confidentiality, *The Post* need not answer.

b. *The Post's "resource materials".*

Plaintiffs have requested that ·*The Post* produce the following materials:

> All [drafts, re-writes,] memoranda, notes, diagrams, communications, memoranda to files, notes for proposed other stories, notes concerning and/or transcripts or tapes of conferences or meetings, deleted materials, and all other materials or documents generated during the development, investigation, or composition of the November 30th, December 1st, and/or December 7th articles, and/or any other articles related to the subject matter of the aforementioned articles, which may have been proposed or planned.

Request II, ¶¶ 2, 3. Plaintiffs also have requested that defendants produce all documents that "relate to the existence or credibility of all sources of information for the November 30th, December 1st, and/or December 7th articles, and/or any other articles, which may have been proposed or planned." Request II, ¶ 4.

*The Post* defendants object to the production of any documents that fall within these document requests other than pre-existing documents generated by persons outside the staff of *The Washington Post*.[2] *The Post* therefore refuses to produce any "internally

**2.** *The Post* also objects to the production of two pre-existing documents, both anonymous notes, on the ground that disclosure would tend to reveal the identity of confidential sources. The Court has discussed the confidential source issue in the preceding section of this memorandum and fully expects the parties to resolve any confidentiality issues in accordance with the views previously expressed.

generated materials, such as reporters' notes, drafts of the articles, and internal communications at *The Post.*" Defendants' Response to Plaintiffs' Second Request for the Production of Documents at 2. Defendants argue that these materials are protected against disclosure by reason of the first amendment protection afforded newsmen and newsgathering activities. *Id.*

The Court agrees with *The Post* that the first amendment extends a degree of protection to journalists subject to discovery demands that impinge upon editorial and newsgathering activities. In balancing a litigant's right to compel discovery against a newsman's assertion that discovery will intrude upon protected first amendment rights, a court must not only weigh the litigant's need for discovery, *see Herbert v. Lando*, 441 U.S. 153, 169–70, 99 S.Ct. 1635, 1645–46, 60 L.Ed.2d 115 (1979) (noting the significance of direct evidence of editorial state of mind in resolving the issue of actual malice), but also must carefully consider the seriousness of the intrusion on the editorial and newsgathering processes, *see SEC v. McGoff*, 647 F.2d 185, 190–91 (D.C.Cir.), *cert. denied*, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 974 (1981); *Maughan v. NL Indus.*, 524 F.Supp. 93 (D.D.C.1981) (order quashing subpoena for production of reporter's notes). Obviously, the more fundamental the impact upon the first amendment rights of the press, the greater the need for discovery must be before a court will order an intrusion. *See United States v. Cuthbertson*, 630 F.2d 139, 148 (3d Cir. 1980) (adopting a balancing test that weighs the litigant's need for information against the interests underlying a qualified, journalistic privilege), *cert. denied*, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981).

In addition, a court also must be sensitive to the availability of alternative means by which a litigant might acquire the same information without intruding upon a journalist's protected activities. *See Maughan v. NL Indus., supra.* Indeed, the availability of alternative means of obtaining sought-after information would counsel strongly in favor of absolute protection of a journalist's newsgathering and editorial processes. As the Supreme Court has emphasized repeatedly in other contexts, courts should endeavor to limit intrusions upon first amendment activities to the least restrictive alternative whenever possible. *See, e.g., Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 562, 96 S.Ct. 2791, 2804, 49 L.Ed.2d 683 (1976) (discussing least restrictive alternative analysis in prior restraint context); *Heffron v. International Society of Krishna Consciousness*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (upholding a "place and manner restriction" on speech in part because no less restrictive means were available). This Court has recognized as much in its memorandum and order issued on September 10, 1981, which granted *The Post* protection against the compelled disclosure of confidential sources, at least until plaintiffs had demonstrated that no alternative means existed for acquiring the same information. *See* September 10th Memorandum at 16–17.

Applying these general principles to the question whether plaintiffs are entitled to compel a response to their request for *The Post*'s internal memoranda, drafts of articles, communications, and other materials related to the editorial and newsgathering processes, the Court is convinced that defendants' legitimate first amendment interests must yield to plaintiffs' need for discovery of this information. Although other decisions indicate that a journalist's first amendment interests are entitled to weight in ruling upon a litigant's motion to compel, the decisions that have afforded the most extensive protection to the editorial or newsgathering processes are non-libel actions in which the journalist or newspaper protesting discovery has not been a litigant. *Cf. SEC v. McGoff*, 647 F.2d 185, 191 (D.C. Cir.1980) (granting protection against compelled disclosure of "editorial policy or news gathering" during SEC investigation of newsman), *cert. denied*, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 974 (1981); *Loadholtz v. Fields*, 389 F.Supp. 1299, 1300 (M.D.Fla. 1975) (granting protective order against the

compelled production of a non-party reporter's "resource materials" during civil discovery between non-media litigants); *Maughan v. NL Indus.*, 524 F.Supp. 93 (D.D.C. 1981) (order granting non-party reporter protection similar to that granted in *Loadholtz*). In the context of civil discovery between a libel plaintiff and a media defendant, however, the protection afforded a journalist's editorial or newsgathering activities has not been nearly as extensive. *See generally Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).

In the Court's opinion, the *Lando* decision provides the proper framework for analysis of *The Post*'s first amendment contentions. In rejecting a media defendant's assertions of an absolute privilege against compelled disclosure of the editorial process, the Supreme Court indicated its firm intent to preserve the balance struck in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), between the reputational interests of public libel plaintiffs and the first amendment interests of press defendants. 441 U.S. at 169–70, 99 S.Ct. at 1645–46. The balance achieved in *New York Times* is, of course, the now well-established "actual malice" standard, which protects the press from liability in public figure libel suits unless the plaintiff can prove "knowing or reckless falsehood" on the part of the defendant.[3] 441 U.S. at 159, 99 S.Ct. at 1640; *see New York Times Co. v. Sullivan*, 376 U.S. at 280, 84 S.Ct. at 726; *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967). In view of the difficulty already faced by public figure plaintiffs in attempting to satisfy this rigorous standard, the *Lando* court declined to place yet another hurdle in their path by erecting an impenetrable "editorial privilege" against disclosure of "editorial conversations [or] a reporter's conclusions about the veracity of the material he has gathered." 441 U.S. at 171, 99 S.Ct. at 1646; *see id.* at 169–70, 175, 99 S.Ct. at 1645–46, 1648. Rather, the Court approved inquiry into the editorial and newsgathering process as an essential aspect of a public figure plaintiff's effort to establish a media defendant's culpable state of mind. *See id.* at 165 & n.15, 169–75, 99 S.Ct. at 1643 & n.15, 1645–49.[4] Protection of media defendants from harassment or from unwarranted intrusions into private editorial functions, the *Lando* court therefore concluded, must ultimately be left to the sound discretion of the trial judge in controlling the permissible scope of discovery. *Id.* at 177, 99 S.Ct. at 1649 (noting the "ample powers of the district judge to prevent abuse").

In exercising this broad discretion, the Court is of the view that plaintiffs are entitled to probe the editorial and newsgathering processes of *The Post* insofar as the investigation is limited to the allegedly libelous articles at issue in this lawsuit. *Cf. Cervantes v. Time, Inc.*, 464 F.2d 986, 994 (8th Cir. 1972) (defendants voluntarily provided libel plaintiff with "hundreds of documents utilized in preparation of the [allegedly libelous] article"), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973). The Court also will permit inquiry into the circumstances leading up to the publication of the December 7, 1979 article referred to in plaintiffs' second document request. *See* Request II ¶¶ 2, 3. From its description, this article appears sufficiently related to the November 30th and December 1st articles to justify a further intrusion into *The Post*'s editorial processes. *Cf. Herbert v. Lando*, 73 F.R.D. 387, 396–97 (S.D.N.Y.1977) (ruling post-publication activities, writings, and statements relevant and discoverable), *aff'd*, 441 U.S. 153, 99 S.Ct. 1635,

---

3. Even nonpublic figures must establish some degree of fault by a media defendant to establish liability. 441 U.S. at 159, 99 S.Ct. at 1640; *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347–48, 94 S.Ct. 2997, 3010–11, 41 L.Ed.2d 789 (1974).

4. The Court cited with approval a long line of libel cases in which courts had affirmed both the relevance and the admissibility of evidence concerning the editorial process of press defendants. *See* 441 U.S. at 165 n.15, 99 S.Ct. at 1643 n.15 and cases cited. In none of these cases, the Court noted, did any language suggest that special, more limited, discovery rules were applicable to the press. *Id.*

60 L.Ed.2d 115 (1979). With regard to these three published articles, therefore, the Court will order *The Post* to comply with plaintiffs' requests for related resource materials, editorial communications, drafts, and the like. *See Buckley v. Vidal*, 50 F.R.D. 271, 273–74 (S.D.N.Y.1970). Only through discovery of these materials, which directly relate to *The Post* journalists' states of mind in publishing the allegedly false articles at issue in this suit, will the plaintiffs have a fair opportunity to satisfy the actual malice standard: showing, with convincing clarity, defendants' actual knowledge of falsity or their "subjective awareness of probable falsity." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334–35 n.6, 94 S.Ct. 2997, 3004–05 n.6, 41 L.Ed.2d 789 (1974). *See generally* Barron, *The Rise and Fall of a Doctrine of Editorial Privilege: Reflections on Herbert v. Lando*, 47 Geo. Wash.L.Rev. 1002 (1979).

### c. *Unpublished information.*

■ Applying the legal principles discussed in section I.b., *supra*, the Court, in the exercise of its broad discretion in matters related to discovery, will grant *The Post* protective relief against compelled disclosure of internal documents or communications relating to proposed or planned articles that never reached fruition. Unlike the crucial relevancy of resource materials that pertain to the *published* articles discussed in the preceding section, the relevancy of resource materials that pertain to proposed articles, ones that never reached print in *The Post*, is far less obvious. The Court has considered plaintiffs' argument that these "unpublished" materials might shed some light on defendants' motivations for publishing the articles at issue in this suit, but finds the potential evidentiary value likely to be minimal, at best. On plaintiffs' side of the balance, therefore, the Court must find a diminished need for these materials. On the other side of the balance, the Court considers *The Post*'s interests in preserving the confidentiality of its editorial and newsgathering processes to be of somewhat more moment when unpublished information is concerned. After all, this lawsuit, as with all libel suits, is about information *The Post* chose *to publish*, not information defendants elected *to leave*, for whatever editorial reasons, within the confines of the newsroom. For these reasons, the Court concludes that, on balance, *The Post*'s interests in the integrity and confidentiality of its editorial and newsgathering processes outweigh plaintiffs' right to discover "unpublished" information. Accordingly, the Court will exercise its power to restrict discovery, *see Herbert v. Lando*, 441 U.S. at 177, 99 S.Ct. at 1649, and deny plaintiffs' motion to compel with regard to this category of information.

### d. *Documents in Sandy Golden's possession.*

■ Plaintiffs seek any documents in the possession of defendant Sandy Golden that relate to the subject matter of the two allegedly libelous articles in question. Defendants refuse to produce these materials on the ground that Golden's newsgathering activities were "independent" of the newsgathering activities of *The Post*, including the two articles the publication of which precipitated this libel action.

The Court, however, cannot classify the activities of defendant Golden, designated a "special correspondent" on the November 30th article, as wholly independent of the activities of *The Post*, in general, and Patrick Tyler, in particular. Although *The Post* avers that the efforts of defendant Golden contributed in no way to the substantive preparation or publication of the November 30th and December 1st articles, Golden's own resume, as well as the by-line on the November 30th article, belie this contention. The Court also considers the materials potentially relevant. Materials in Golden's possession may reveal further his contribution—or lack of contribution—to the articles in question. Considering the initial contacts between Tyler, Golden, and some of the sources for the two articles, information gleaned by Golden during these contacts may well help to illuminate the credibility of these sources or the veracity of any statements that ultimately appeared

in the articles. Accordingly, the Court will order *The Post* and defendant Golden to disclose the requested materials.

### e. *Evidence of unrelated prior acts.*

■ Plaintiffs have requested the production of (1) letters of complaint and threats of lawsuit received by *The Post* during the last ten years that pertain to the defamatory nature of any articles published in *The Post*; (2) information concerning other libel actions against *The Post*; and (3) retractions recently published by *The Post*. Interrogatories I, ¶ 3; Request II, ¶ 1. *The Post* objects to production on the grounds of overbreadth and relevancy.

The Court agrees with these objections and will exercise its discretion to grant defendants the protective relief requested. As *The Post* defendants note, evidence of unrelated prior acts is inadmissible under rule 404 of the Federal Rules of Evidence. The rule states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity" with that character on a particular occasion. Fed.R. Evid. 404(b). Because evidence of unrelated prior acts is inadmissible under rule 404(b), *see Gariepy v. Pearson*, 120 F.Supp. 597, 598 (D.D.C.1954), and because the Court rejects plaintiffs' argument that these acts are somehow admissible as evidence of "habit" under rule 406, *cf. Levin v. United States*, 338 F.2d 265, 272 (D.C.Cir. 1964) (observing that "habitual conduct is largely free from the complicating and confusing element of volition") (quoting Chamberlayne, *Modern Law of Evidence*, § 3204, at 4433), *cert. denied*, 379 U.S. 999, 85 S.Ct. 719, 13 L.Ed.2d 701 (1965), this category of information also appears unlikely to lead to any admissible evidence. In light of this conclusion, and considering the manifest burden production would entail, plaintiffs' motion to compel is denied and defendants' motion for a protective order granted as to this information.

### f. *Opinions of The Post defendants about journalistic standards.*

■ Plaintiffs' request, and defendants object to, the production of defendants' lectures, speeches, discussions, and communications about journalistic standards considered necessary and proper by *The Post*. Interrogatories I, ¶ 1; Request II, ¶ 1. The Court is aware of the burden that compliance with this extremely broad interrogatory would cause *The Post* and, therefore, will grant defendants part of the protective relief requested. Because these materials might lead to some relevant evidence, however, the Court will order a response to a narrower category of information. Defendants shall produce any formal, written materials generated during 1979, the year of publication, that pertain to *The Post*'s or the individual defendants' opinions about journalistic standards. By "formal, written materials," the Court means speeches, articles, and written memoranda that embody these standards; discussions, conversations, and informal notes or notations are excluded from this definition and need not be produced. By narrowing the scope of this discovery request and limiting the time period for which a search must be conducted to 1979, the Court intends to extend *The Post* protection within the relatively liberal federal rules on discovery.

### g. *The Post defendants' personnel files.*

■ The Court considers this discovery request objectionable and will grant defendants protection against compelled disclosure of the individual defendants' mental health records. The information sought is not only of dubious, if any, relevancy, but also of a highly personal and confidential nature. Production of this kind of information would constitute an unwarranted invasion of the individual defendants' privacy. Plaintiffs' motion to compel this category of information is therefore denied.

### II. *The Deposition of William L. Green.*

■ Although not completely satisfied with plaintiffs' justifications for this deposition, the Court will grant plaintiffs' motion to compel the deposition testimony of *The Post*'s former ombudsman, William L.

Green. For defendants' benefit, however, the Court will impose certain limitations on the place and scope of that deposition. First, unless defendants otherwise agree, the deposition shall be taken where Mr. Green resides; he need not travel to the District of Columbia solely for the purpose of this deposition. Second, the deposition shall be limited to questions concerning Mr. Green's knowledge of the journalistic practices and standards of *The Post* during the time period roughly contemporaneous with the publication of the November 30th and December 1st articles. Roughly contemporaneous, in the Court's opinion, means from June 1, 1979, to May 30, 1980, a period of six months before and after publication. Specifically, Mr. Green need not answer any questions relating to articles published outside this time period, including the Janet Cooke article entitled "Jimmy's World", among others. The Court views the discovery efforts of plaintiffs concerning Mr. Green far afield from the true focus of this lawsuit: the truth or falsity of the November 30th and December 1st articles—published nine months before Mr. Green assumed his position as *The Post*'s ombudsman—and the culpable state of mind, or at least negligence, of defendants in publishing them. Other than his knowledge of the inner workings of *The Post* during the time period roughly contemporaneous with these allegedly libelous publications, it appears that Mr. Green would be unlikely to have other information that is relevant and admissible or likely to lead to relevant and admissible evidence. Consequently, the Court will permit plaintiffs to conduct the deposition of Mr. Green, but only upon the above conditions.

*Conclusion*

In sum, the Court wishes to reiterate its directive that the parties proceed expeditiously with discovery in this action in accordance with the views expressed in this memorandum and in prior opinions. To prod counsel along somewhat (a judicial service that appears essential in this case), the Court again notes its intent to set a spring trial date in this action in the near future. A status hearing will be called for this purpose in the next few weeks.