**John M. DOWD, Plaintiff,**

v.

**Samuel Ray CALABRESE, Defendant.**

**William M. KRAMER, Plaintiff,**

v.

**Samuel Ray CALABRESE, Defendant.**

**William M. KRAMER, Plaintiff,**

v.

**James A. DRINKHALL, et al., Defendants.**

**John D. DOWD, Plaintiff,**

v.

**James A. DRINKHALL, et al., Defendant.**

**James A. DRINKHALL, Plaintiff,**

v.

**William M. KRAMER, Defendant.**

Civ. A. Nos. 80–0911, 80–0912, 80–3324, 80–3325 and 81–1266.

United States District Court, District of Columbia.

Oct. 26, 1983.

---

Thomas C. Green, Washington, D.C., for plaintiffs.

Michael T. Kenney, Santa Anna, Cal., Michael N. McCarty, Sara E. Lister, Togo D. West, Jr., Patterson, Belknap, Webb & Tyler, Washington, D.C., Gregory L. Diskant, Patterson, Belknap, Webb & Tyler, New York City, Richard A. Levie, U.S. Dept. of Justice, Civ. Div., John C. Martin, Asst. U.S. Atty., Washington, D.C., for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

These consolidated defamation actions arise out of two articles written by one Jim Drinkhall and published in the *Wall Street Journal* in April and December 1979. The first, "Ordeal at McNeil: Federal Lawmen Plan an Unpleasant Future for Sam Ray Calabrese," described the alleged plans of plaintiff William Kramer, a San Francisco-based member of the Department of Justice's Organized Crime Strike Force, to pressure a federal prisoner into providing evidence to the government about a supposed "underworld" associate. The reader is given some details of the plan to pressure Calabrese in what purport to be Kramer's own words;[1] other statements about Calabrese's usefulness as a govern-

---

1. For example, the eighth paragraph of the article reads as follows:

'We're going to get Sam to give us [Morris] Shenker or we're going to bury him,' Mr. Kramer says bluntly.

ment informant are attributed to plaintiff John Dowd, then a strike force attorney based in Washington, D.C.[2] The second article, "A Reporter's Tale: Aftermath of Article on U.S. Prosecutors," reports that Kramer "set out to prove that I took a bribe from the mob to do the [first] story." The article recites how journalistic colleagues of Drinkhall and others were asked for derogatory information about him and how a rumor was circulated that he had written the first article because he was on the payroll of organized crime.

As part of their discovery against the media defendants[3] Dowd and Kramer deposed Drinkhall on several occasions seeking, *inter alia*, the names of confidential sources with whom Drinkhall claims to have talked during preparation of the articles. When Drinkhall declined to produce the names, instead invoking the reporter's privilege grounded in the First Amendment, plaintiffs filed the instant motion seeking an order compelling Drinkhall to name the individuals or to admit that he had no sources[4]—the alleged fabrication of the sources being plaintiffs' theory of the case.

Drinkhall has insisted that his off-the-record sources do exist, and that, in fact, there were eleven such sources who provided pieces of information[5] for either the first or second article. All of them, however, are claimed to have provided their information with the understanding that their identities would not be revealed by Drinkhall. Accompanying defendants' post-argument memorandum was an affidavit by Drinkhall identifying an FBI agent—labelled "A" by the parties—as one of the eleven sources.[6] Drinkhall has refused to identify the remaining ten individuals. The Court must therefore determine whether Drinkhall has properly invoked the privilege with respect to these ten sources, or whether the privilege must yield to plaintiffs' discovery needs.

I

The Court of Appeals for this Circuit first recognized a qualified reporter's privilege under the First Amendment in *Carey v. Hume*, 492 F.2d 631 (D.C.Cir.1974). In *Carey*, also a libel case, a disclosure order was upheld after the court "weigh[ed] the need for the testimony in question against the claim of the newsman that the public's right to know is impaired." 492 F.2d at 636. The court made it clear that such a balancing is to be undertaken on a case-by-case basis and, on the facts in *Carey*, it determined that since confidential sources had been the only basis for the article in question, disclosure of the sources' identi-

---

2. Dowd is quoted as telling Drinkhall that during a prior investigation of Calabrese, Calabrese "approached him and his coprosecutor, Mr. Kramer, and asked, 'When are you going to get off my back?' Mr. Dowd says he replied, 'Sam, when you give us Shenker, you can walk.'"

3. In two of the actions Dowd and Kramer each sue reporter Drinkhall, editor Laurence O'Donnell, and the *Wall Street Journal*'s owner, Dow Jones & Co. Dowd and Kramer also each sue Calabrese. In the fifth action Drinkhall sues Kramer for slander. In addition, there is a counterclaim by Calabrese against Kramer alleging violation of civil rights. Kramer and Dowd will be referred to herein as the plaintiffs, the *Wall Street Journal* and Drinkhall as the defendants.

4. Plaintiffs also request previously withheld portions of Drinkhall's original notes and telephone bills that correspond to any confidential source whose identity the Court might order Drinkhall to disclose.

5. Defendants assert that of the 78 sentences alleged by plaintiffs to be false and defamatory in the two articles, only three are based exclusively on information provided by confidential sources while four others derive in part from information provided by confidential sources.

6. Drinkhall stated that he had decided to reveal the source's identity because Sheehan had "abused my promise of confidentiality by making false statements to me and by volunteering statements to the plaintiffs that are false and destructive to me and that clearly identify him as my source." Affidavit of Jim Drinkhall, filed May 26, 1982, at 2. Plaintiffs respond that the timing of Drinkhall's revelation is suspect since he waited to make it until after his last scheduled deposition had ended. They also dispute his assertion that Sheehan was his most important confidential source.

ties was "critical" to plaintiff's claim. 492 F.2d at 636, 637.

The Court of Appeals considered the privilege more recently in *Zerilli v. Smith*, 656 F.2d 705 (D.C.Cir.1981), a privacy action. The *Zerilli* decision left the *Carey* standards intact, stating that

> the civil litigant's interest in disclosure should yield to the journalist's privilege ... in all but the most exceptional cases.

656 F.2d at 712. The *Zerilli* court also offered more detailed guidance on how lower courts are to apply the *Carey* standards. See also, *Tavoulareas v. Piro*, 93 F.R.D. 11 (D.D.C.1981); *Tavoulareas v. Piro*, 93 F.R.D. 35; *Liberty Lobby, Inc. v. Anderson*, 96 F.R.D. 10 (D.D.C.1982).

■ *Carey* and *Zerilli* teach that relevance of the sources' identities to plaintiffs' case, particularly to their burden of proof, and the availability of unexhausted, alternative means of obtaining the sources' identities are the primary factors to be considered in evaluating whether a reporter's claim of privilege should be overridden.[7] First, a high degree of relevance is required: the sources' identities must go to "the heart of plaintiff's claim." *Carey v. Hume, supra*, 492 F.2d at 634, 636, quoting *Garland v. Torre*, 259 F.2d 545 (2d Cir. 1958). Second, "[e]ven when the information is crucial to a litigant's case, reporters should be compelled to disclose their sources only after the litigant has shown that he has exhausted every reasonable alternative source of information." *Zerilli v. Smith, supra*, 656 F.2d at 713. Third, where the journalist is a defendant in a libel action and the privilege "will effectively shield him from liability, the equities weigh somewhat more heavily in favor of disclosure." *Zerilli v. Smith, supra*, 656 F.2d at 714.

II

Plaintiffs contend that they need the sources' identities for two purposes: to prove that the allegedly defamatory assertions of fact in the stories are false, and to undermine Drinkhall's credibility. Plaintiffs' theory is that Drinkhall fabricated the statements attributed to Dowd and Kramer in the articles and that the unnamed individuals who, according to Drinkhall, confirmed what Dowd and Kramer said either never spoke to him about the stories or were misquoted.[8]

The sources whose identities are sought fall into several categories. In the first group are two government attorneys with whom Drinkhall allegedly spoke prior to the publication of the first article but who furnished no material actually relied or reported on.[9] If the Court were to order disclosure of these sources, and if Drinkhall were to respond by offering two names, it is plaintiffs' hope or expectation that the individuals so named could be deposed and would contradict Drinkhall's version of their conversations, if conversations had occurred at all. These speculations are an insufficient basis for compelled disclosure.

■ Even if plaintiffs' forecast proved to be accurate, the testimony of the two indi-

---

7. The third factor, that plaintiff's claim be non-frivolous, is satisfied in this case.

8. Plaintiffs argue that exposing the non-existence of Drinkhall's confidential sources, particularly the five who, according to Drinkhall, confirmed various details of the plan to pressure Calabrese, will bolster their contention that they never said to Drinkhall what Drinkhall wrote that they said but rather that the source of the article was Calabrese himself.

9. The first is a source in the Department of Justice to whom Drinkhall reportedly announced that he had taped his conversations with Dowd and Kramer. Drinkhall has subse-

quently admitted that he did not make any such tapes and that he pretended he did, hoping that word of the tapes' existence would be passed to Dowd and Kramer, thereby dissuading them from contesting the accuracy of his story. Plaintiffs believe that they know this source: they deposed the then chief of the Organized Crime and Racketeering Section who stated that Drinkhall told him he had taped the conversations. Drinkhall, however, denies that this individual is the confidential source in question.

The second is a federal strike force attorney who is said to have called Drinkhall to persuade him to "kill" the story, mistakenly thinking the story was about an attorney other than Dowd or Kramer.

viduals would provide no information concerning the truth or falsity of the information contained in the articles, nor would it be material to the question of defendants' actual malice—that is, whether they knew that there was no plan to pressure Calabrese or recklessly disregarded whether this assertion was true or false—or of their negligence.[10] Rather, the testimony of these two sources would relate solely to Drinkhall's credibility on collateral matters. To be sure, Drinkhall's credibility is an important issue in the case, but his credibility with respect to two conversations not part of his newsgathering for the articles is far from "the heart of plaintiffs' claim." In addition, as the pleadings and affidavits indicate, Dowd and Kramer have many alternative sources of evidence bearing on Drinkhall's credibility.[11] The Court concludes that the First Amendment interest in protecting these two sources far outweighs plaintiffs' need for what would be collateral and cumulative evidence at best, and the motion to compel with respect to these two sources will be denied.

### III

The second group of sources are those ostensibly relied upon by Drinkhall for several allegedly false and defamatory quoted statements or unquoted assertions of fact in the two articles. It seems clear that these sources are of greater relevance on the questions of falsity and malice or negligence than are the two sources referred to above: if Dowd and Kramer are able to show that no sources existed—or that the sources, if they acknowledge having spoken with Drinkhall, dispute the accuracy of the statements they supposedly made or confirmed—plaintiffs' chances of proving

falsity would be enhanced. The sources' testimony might also provide evidence on the issue of malice to the extent that the testimony indicated that Drinkhall "in fact had no reliable sources, or that reliance upon those particular sources was reckless." *Carey v. Hume, supra,* 492 F.2d at 637. What is less clear, however, is the extent to which several of the individuals would make substantial contributions to plaintiffs' case.

The bulk of the allegedly false and defamatory matter in the first article concerns Kramer's alleged plan, supposedly acquiesced in by Dowd, to pressure Calabrese through physical harm, additional prosecution, and financial ruin of his family. An "outline" of these steps is attributed to Kramer; the article also reported that the existence of such a plan had been confirmed by "strike force lawyers and other sources." In addition, an unnamed "federal attorney" is quoted as saying "there's more going on than meets the eye." Finally, the fifth paragraph reads:

> According to the prison grapevine, [Calabrese] has been attacked at least twice by other inmates and hospitalized. It has been alleged that federal attorneys themselves may have provoked the attacks by planting rumors at McNeil [Prison] about Calabrese.[12]

In response to plaintiffs' requests for Drinkhall's sources, Drinkhall provided some identifying information. He testified in depositions that four FBI agents were largely responsible for the information in the second sentence of the paragraph quoted above,[13] and for providing the initial tips and verifying details about Kramer's pressure tactics. The parties dubbed these individuals sources A, B, C, and D. As noted

---

**10.** The parties have not yet briefed, and the Court has not decided, whether Dowd and Kramer are public figures such that malice would be the appropriate standard of care or private figures.

**11.** Plaintiffs claim to have spoken with numerous McNeil Island prison officials, journalists, and federal law enforcement officers who dispute statements made by Drinkhall both in the article and at his deposition sessions.

**12.** To be sure, Kramer's denial that Calabrese had already been beaten in prison and hospitalized is included in the next following paragraph.

**13.** Defendants also contend that conversations with two prisoners, with a nonconfidential strike force lawyer, and with Kramer helped form the basis for the assertion.

above, Drinkhall has identified the person he contends was source A. Sources B, C, and D remain undisclosed, as does the "federal attorney," but plaintiffs state that they believe they know whom Drinkhall would name if forced to reveal this latter individual.[14]

Regarding falsity, the four unnamed sources could add something to other, nonconfidential avenues of proof available to plaintiffs, but that addition would not likely be critical. Plaintiffs' counsel claim to have the affidavits of numerous prison authorities and federal law enforcement personnel stating that Calabrese was not beaten and that they had never heard of a plan like that described in the first article, and plaintiffs could, of course, depose as many of these potential witnesses as they desire. Further, plaintiffs could introduce prison hospital records which would contradict the article's assertion that Calabrese had been hospitalized, if in fact he had not been. Also, the Department of Justice issued a report finding no evidence "that the campaign of harassment described in the article was either planned or implemented."[15] In addition, plaintiffs have the deposition testimony of Joseph Sheehan denying that he was Source A and claiming that Drinkhall asked him to lie in his favor about the prison beatings. Plaintiffs also state that numerous nonconfidential sources identified by Drinkhall at his depositions have denied making the statements attributed to them.

While the Court intimates no view of the merits of plaintiffs' case, it is thus apparent that plaintiffs do have substantial evidence of falsity. If the four unnamed federal employees were to testify as plaintiffs predict, the parade of law enforcement officers disputing the truth of the articles would be longer, but to little substantive avail: the only additional evidence contributed by the four sources—under the scenario most favorable to plaintiffs—would be that in addition to disputing the accuracy of the article—as Kramer, Dowd, Source A, and various non-confidential sources are equally likely to do—they dispute Drinkhall's claim that they had been his sources. Thus, in the context of this case, the identities of the remaining four confidential sources for the first article would bear essentially on Drinkhall's credibility rather than on falsity.

On the issue of malice, the unnamed sources would be somewhat more relevant to the proof of plaintiffs' principal allegation that Drinkhall knowingly distorted statements they had given to him.[16] There is no way of avoiding a credibility contest on this issue. Fabricated, noncorroborating, or untrustworthy sources could shed some light on Drinkhall's credibility, thoroughness, judgment, and belief in the stories' accuracy, but they would only tangentially provide evidence going to the heart of the matter: did Dowd and Kramer make the statements attributed to them or did they not?[17]

■ There is, however, another dimension to plaintiffs' claim. Their assertion is not the usual one—that the unnamed infor-

---

**14.** Plaintiffs state that they have an affidavit of this individual in which he claims that he did speak to Drinkhall but that, if he is the purported source for the remarks in the article, they were taken out of context.

**15.** The *Wall Street Journal* published the results of the investigation in August 1979.

**16.** Dowd and Kramer do not dispute that they spoke with Drinkhall in February 1979, before the appearance of the first article.

**17.** The first article is unlike many investigative pieces whose subjects either are not quoted or are quoted as denying comment and which pur-

port to be based upon information gathered from named or unnamed third parties, *e.g.,* the article in *Carey v. Hume, supra,* the only cited source for which was "an undisclosed informant." *Tavoulareas v. Piro,* 93 F.R.D. 11, 17 n. 8 (D.D.C.1981). See also *Miller v. Transamerican Press, Inc.,* 621 F.2d 721, 726 (5th Cir.1980). In the latter type of case, the identity of sources is relevant to the malice issue because the plaintiff hopes to prove that there were "obvious reasons to doubt the veracity of the informant or accuracy of his reports." *St. Amant v. Thompson,* 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968).

# 244

mants were inherently unreliable [18]—but that the alleged sources either never spoke to Drinkhall about these particular stories at all or that, if they did, they gave him information which wholly failed to substantiate the plan to pressure Calabrese or the involvement of plaintiffs in such a plan. In that posture, plaintiffs' real concern appears to be that defendants will use the existence of unnamed, reliable sources as part of their defense, arguing that these sources confirmed the first article's accuracy even if that were totally untrue.

This fear is by no means chimerical. Again, without in any way passing upon the substantive merits as they will ultimately be revealed at the trial, it appears to the Court that plaintiffs have made at least a threshold showing that Drinkhall did indeed fabricate the existence of some sources or misrepresent the evidence they would be likely to provide.[19] Nor is it a complete answer—as defendants would have it—that plaintiffs already have ample evidence indicating fabrication, and that therefore under *Zerilli, supra*, withholding of the purported identities of sources B, C, and D, and the "federal attorney" would not "effectively shield" defendants from liability. If indeed defendants were to use the existence of these sources as proof of the truth of Drinkhall's article and of defendants' lack of malice, plaintiffs would be at a very substantial disadvantage which they would be unable to overcome irrespective of what evidence to the contrary they may have gathered and would be able to adduce. At least when there are already indications of fabrication, it would be wholly unfair to leave plaintiffs in this predicament.[20]

For these reasons, defendants' position—that in effect they can have it both ways [21]—cannot be sustained. It does not follow, however, that defendants must be compelled to reveal the identity of these sources, for an alternative is available which will substantially allay plaintiffs' concerns without directly infringing on First Amendment interests. Since the identity of the sources and their alleged support for the first Drinkhall article appear to be primarily matters of defense, the Court can, and it will, direct the defendants that they may not rely upon the existence of any unidentified source as evidence of truth or lack of malice of the first article. See, *e.g., DeRoburt v. Gannett Co., Inc.,* 507 F.Supp. 880, 887 (D.Haw.1981); *Greenberg v. CBS*, 69 A.D.2d 693, 419 N.Y.S.2d 988, 998 (1979); see also, *Tavoulareas v. Piro, supra,* 93 F.R.D. at 17; Note, *Source Protection in Libel Suits After Herbert v. Lando,* 81 Col.L.Rev. 338, 364 (1981).[22] An order to that effect is accordingly being entered contemporaneously herewith.

## IV

Four additional unnamed individuals are said by Drinkhall to have acted as sources for the second article. Three strike force attorneys other than those involved in the preparation of the first article [23] reportedly told Drinkhall that the Department of Justice had asked them to pass on to the Department anything derogatory they heard about him. A fourth Chicago strike force lawyer, not mentioned by name, is alluded to as having "provided another tid-

18. The informants are said to be federal attorneys and law enforcement officers whom Drinkhall knew due to his organized crime "beat" or area of specialty.

19. See, *e.g.,* Affidavit of Thomas C. Green, filed January 18, 1982.

20. Whatever defendants' present claims regarding the sufficiency of plaintiffs' evidence, they may confidently be expected to argue to the contrary to the jury.

21. *I.e.,* that they can refuse to divulge the identity of the sources but rely on them at trial, and that they can argue now that plaintiffs' evidence is sufficient and at trial that it is not.

22. Defendants can, of course, avoid the effects of this direction by revealing the sources well in advance of trial.

23. Information provided by Drinkhall limits the pool of these attorneys to a group of 24, which includes all strike force attorneys located in Kansas City, Chicago, and Los Angeles at the relevant time.

bit: A court-authorized wiretap by one strike force, Mr. Kramer told him, recorded one mobster [referring to Drinkhall as 'our boy']."

Plaintiffs have already deposed one individual, a former investigator with the Newark strike force and a nonconfidential source, said by Drinkhall to have told him in advance of the second article that he heard Kramer made the statement about the wiretap. If this nonconfidential source at trial denies having given this information to Drinkhall—as apparently he will [24]—it would be Drinkhall, not plaintiffs, who would suffer for not being able to call the cited source, the as yet unidentified government lawyer, who might vouch for the statement's accuracy.[25] On the other hand, to the extent that the nonconfidential source was worthy of Drinkhall's reliance and at trial confirms Drinkhall's account of their conversation, nothing the confidential source could add would detract from the inference of no malice with respect to this part of the article. See *Zerrilli v. Smith, supra,* 656 F.2d at 714; *Tavoulareas v. Piro, supra,* 93 F.R.D. at 16 (both citing *Cervantes v. Time Inc.,* 464 F.2d 986 (8th Cir.1972)); *Liberty Lobby, Inc. v. Anderson,* 96 F.R.D. 10, 12 n. 2 (D.D.C.1982) ("[W]here the truthfulness or falsity of the statements at issue can be established by other independent means of discovery or there exist other sources and information which could establish the absence of malice or recklessness by the publisher of the article, they must be pursued first, and compelled disclosure of confidential sources should be denied"). Thus, the identity of the attorney who supposedly confirmed Kramer's remarks about the wiretap is not crucial to plaintiffs' case and the Court will not order Drinkhall to reveal his name.

The situation differs with respect to the three strike force attorneys. Although defendants claim that any request by the Department of Justice for derogatory information about Drinkhall is not "of or concerning" Kramer, and therefore could not have defamed him, a jury could find that Drinkhall's second article implied that the Department was acting at Kramer's behest. *No nonconfidential source for this information is cited in the article; Drinkhall attributed it solely to the three unnamed attorneys.* See, *e.g., Carey v. Hume, supra.* Thus, denials by the attorneys that they disclosed the existence of a smear campaign to Drinkhall might be plaintiffs' best proof both of falsity and of malice; documents or nonconfidential sources are not likely to be available as they are with respect to the alleged plan to pressure Calabrese and the details of Calabrese's prison stay.

The identity of the three strike force attorneys may therefore be of substantial importance to plaintiffs in their claim regarding the second article. The Court will not enter definitive orders on this issue at this stage, however, for two reasons. First, it is premature to do so. There is a suggestion that Kramer himself might acknowledge having asked fellow strike force attorneys to help him investigate Drinkhall by passing along information they heard about him.[26] Depending upon further briefing by the parties and other pretrial developments, then, there may be no need for further evidence on this question. Cf. *United States v. Liddy,* 478 F.2d 586, 587–88 (D.C.Cir.1972) (opinion of Leventhal, J.). Furthermore, the motion to compel was filed well before discovery terminated, and the subsequent course of discovery may have obviated or at least minimized plain-

---

24. Plaintiffs have deposed the investigator, John Sikorski, and state that Sikorski denied having talked to Kramer. Rather, Sikorski remembered hearing about Kramer's wiretap claim from another journalist. The journalist, Dan Moldea, denied in an affidavit submitted with plaintiffs' pleadings that he said anything of the sort to Sikorski.

25. Plaintiffs claim that they have affidavits from all Chicago strike force attorneys denying any such conversation with Drinkhall, and that during a deposition Drinkhall said he had been mistaken in attributing the wiretap statement to a strike force lawyer when the real source was Sikorski.

26. Kramer deposition at 313.

tiffs' need for an order to compel. *Carey v. Hume*, 492 F.2d at 638.

For these prudential reasons, the Court will defer a final ruling on the motion to compel regarding the three strike force attorneys. However, in the event that it appears that interim developments have not obviated plaintiffs' need for the information regarding these attorneys for purposes of defending themselves against a claim of reliance by Drinkhall on unknown and unknowable sources, the Court will consider whether plaintiffs have reasonably exhausted alternative means of obtaining the sources' identities such that an order compelling disclosure would be warranted.[27]

### ORDER

For the reasons stated in the Opinion filed this date, it is this 26th day of October, 1983,

ORDERED That plaintiffs' motion to compel is denied with respect to the two government attorneys with whom Drinkhall allegedly spoke prior to publication of the first article and the one strike force attorney referred to regarding a wiretap in connection with the second article, and it is further

ORDERED That the motion to compel is likewise denied with respect to the individuals referred to as B, C, D, and a federal attorney who allegedly were also sources for Drinkhall's first article, provided that defendants shall not rely upon the existence of any unidentified source as evidence of truth or lack of malice with respect to the first article, and it is further

ORDERED That the motion to compel is denied with respect to the three strike force attorneys who allegedly were sources for part of the second article but such denial is without prejudice to its renewal within 45 days of this order.

---

**27.** Because the Court is not at this stage ordering disclosure of any sources' identities, there is no basis for the disclosure of any concomitant notes or telephone records. See note 4 *supra*.